71 F.3d 1502
 John Walter CASTRO, Sr., Petitioner-Appellant,
v.
STATE OF OKLAHOMA; Daniel Reynolds, Warden, Oklahoma State
Penitentiary; and Larry Fields, Director,
Oklahoma Department of Corrections,
Respondents-Appellees.
 No. 94-6430.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 4, 1995.
 
 Vicki Ruth Adams Werneke (Benjamin McCullar with her on the briefs), Oklahoma Indigent Defense System, Norman, Oklahoma, for petitioner-appellant.
 A. Diane Blalock (W.A. Drew Edmondson, Attorney General of Oklahoma, with her on the brief), Assistant Attorney General, Oklahoma City, Oklahoma, for respondents-appellees.
 Before MOORE, ANDERSON, and BRORBY, Circuit Judges.
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 John Walter Castro, Sr. was found guilty by a jury in Kay County, Oklahoma, on April 17, 1984, of armed robbery and felony-murder. He received sentences of death for the felony-murder and life imprisonment for the armed robbery. Mr. Castro's direct appeal and state post-conviction review of his felony-murder conviction and death sentence were denied by the Oklahoma courts.[1] Mr. Castro filed a 28 U.S.C. Sec. 2254 petition for habeas corpus in which he raised thirteen claims for relief and requested an evidentiary hearing. The district court considered Mr. Castro's objections to the Magistrate Judge's findings and recommendations and denied the petition without holding a hearing, however, the court issued a certificate of probable cause. This appeal ensued.
 
 
 2
 We address only one of the issues Mr. Castro raises on appeal. Mr. Castro argues the district court erred in holding the State had no obligation to provide him with expert psychiatric assistance. Because we agree with this contention, we vacate Mr. Castro's death sentence. Our resolution renders it unnecessary for us to consider Mr. Castro's remaining grounds of appeal and we decline to do so.[2]
 
 I.
 
 3
 The underlying facts concerning Mr. Castro's crime are undisputed. On June 6, 1983, Mr. Castro entered Hobo-T's restaurant in Ponca City, Oklahoma. He purchased a soft drink, played a video game, and spoke with the employee-manager Rhonda Pappan. Later that same afternoon, Mr. Castro returned to the restaurant. After again talking to Ms. Pappan, he asked her if they "needed help." When she turned around to retrieve a job application, Mr. Castro pulled an unloaded .25 pistol from his pocket and demanded she open the cash register. According to Mr. Castro, while he was rummaging through either the register or Ms. Pappan's purse, she pulled a knife on him and they struggled. During the struggle, Mr. Castro stabbed Ms. Pappan multiple times killing her.
 
 
 4
 That night, the police apprehended Mr. Castro at his home. After he consented to a search, the police found a .25 pistol, bloody clothing, and other forensic evidence of the crime. At the police station, after changing his story three times, Mr. Castro ultimately confessed to Ms. Pappan's murder.
 
 
 5
 Mr. Castro presented no witnesses in his defense during the guilt/innocence stage of his trial. However, Mr. Castro's trial counsel challenged the voluntariness of his confession. After conducting a hearing, the trial court admitted the confession into evidence. During his closing argument, counsel argued Mr. Castro was only guilty of second degree murder because he never formed the requisite intent to kill Ms. Pappan. The jury rejected this argument, finding Mr. Castro guilty of armed robbery and first degree felony-murder.
 
 
 6
 In contrast, Mr. Castro actively contested the State during the bifurcated penalty phase of his trial.[3] The State presented evidence of two aggravating factors to justify the imposition of a death sentence: (1) the murder was especially heinous, atrocious or cruel; and (2) Mr. Castro constituted a continuing threat to society. Okla.Stat.Ann. tit. 21, Secs. 701.12(4) and (7) (West 1995).
 
 
 7
 On direct appeal, the Oklahoma Court of Criminal Appeals struck down the especially heinous, atrocious or cruel aggravating circumstance on insufficient evidence grounds. Castro v. State, 745 P.2d 394, 408 (Okla.Crim.App.1987). However, after reweighing the evidence, the court upheld Mr. Castro's death sentence. Id. at 408-09; see also Castro v. State, 749 P.2d 1146, 1148-49 (Okla.Crim.App.1987), cert. denied, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988).
 
 
 8
 The State relied on three factors to support the continuing threat aggravating circumstance: Mr. Castro's pretrial escape from Kay County Jail; his confession to committing a prior murder;[4] and his confession to committing two earlier armed robberies in Ponca City. Mr. Castro testified extensively during the penalty phase of his trial, admitting killing Ms. Pappan, the prior murder of Beulah Grace Cox, and his two prior armed robberies.
 
 
 9
 Mr. Castro also testified about his lack of motivation for killing Ms. Pappan. Counsel's strategy during the penalty phase was to have Mr. Castro admit to murder but to avoid a death sentence by having him accept his culpability and attempt to explain why he committed the crime. To facilitate this strategy, Mr. Castro testified he did not know why he murdered Ms. Pappan. He offered the potential explanation "that he thought there was something wrong with his mind." Castro, 745 P.2d at 398. Mr. Castro described his troubled youth, including being raised by poor grandparents, discovering his mother was a prostitute, being seduced by his mother as an adolescent, and witnessing his brother bludgeon his father to death. Mr. Castro expressed remorse for the killings and told the jury, "I think I deserve to die." Id. Mr. Castro's great aunt, Laura Tucker, testified about his traumatic childhood, his experiences with the police as a youth, and his placement four times in juvenile reform institutions. Id.
 
 
 10
 Because an understanding of Mr. Castro's mental health history is crucial to the resolution of this appeal, we describe it in detail. Initially, on July 6, 1983, counsel filed a motion titled, "Motion to Obtain Medical Examination of Defendant." In this motion, counsel delineated his concerns.
 
 
 11
 [W]hile the Defendant was incarcerated in the County Jail of Kay County Oklahoma and from said interview [counsel] developed serious doubts as to the ability of the Defendant to assist counsel in the preparation of the Defendant's defense herein because the Defendant's extremely depressed emotional condition and general confusion relating to the alleged acts with which he has been accused.
 
 
 12
 In addition, at a pretrial hearing Mr. Castro acted bizarrely. In response to counsel's request and Mr. Castro's outbursts, the trial court ordered him transferred to Eastern State Hospital in Vinita, Oklahoma, for a psychiatric evaluation. Although he did not personally examine Mr. Castro, Dr. R.D. Garcia, the hospital's chief forensic psychiatrist, reported the hospital staff's consensus Mr. Castro was competent to stand trial because he was able to comprehend both the proceedings and the charges against him.
 
 
 13
 However, Dr. Sandra Petrick, Ph.D., a staff psychologist and a member of the team that examined Mr. Castro, reached a somewhat different conclusion. Dr. Petrick noted Mr. Castro exhibited "symptoms of depression, if not alleviated to some extent, could render [him] unable to actively assist counsel in the preparation of a defense." She concluded his competency was "dependent upon him receiving information from his lawyer re: court procedures." Dr. Petrick's analysis was not included in Dr. Garcia's report. Although her notes were contained in Mr. Castro's hospital records, they were not submitted to the trial court.[5] Based on Dr. Garcia's report, the trial court ultimately found Mr. Castro competent to stand trial. However, the court never held a formal competency hearing.
 
 
 14
 Mr. Castro continued to exhibit bizarre behavior potentially indicative of an unbalanced emotional or psychological state prior to trial. According to the district court:
 
 
 15
 On July 15, 1983, just prior to being admitted to Eastern State Hospital, the Petitioner began a 3-day fast as a suicide attempt. On July 20, 1983, after his admission to the hospital, the Petitioner made suicide threats. The next day he refused to eat or take medication. On July 22, 1983 the Petitioner became combative over cigarettes and was placed in four-point restraints. The Petitioner was also administered Vistaril, a drug used for relief of anxiety and tension associated with psychoneurosis. On July 27, 1983 the Petitioner was involved in an escape attempt at Eastern State Hospital, and was again placed in four point restraints, and was given two injections of Thorazine.
 
 
 16
 Originally, Mr. Castro pled guilty to the charges against him. The trial court conducted a hearing to determine whether Mr. Castro understood those charges, their factual predicate, and that by pleading guilty he would be waiving all his legal defenses. The trial court allowed Mr. Castro to enter the guilty plea, specifically finding him competent to waive his Sixth Amendment right to a jury trial. Subsequently, however, Mr. Castro was allowed to withdraw his guilty plea, and the trial began.
 
 
 17
 As the case before us unfolds, the nature of the initial request for expert psychiatric assistance becomes critical. From the beginning, Mr. Castro's mental status and the need for him to be examined by a psychiatrist was an issue. Indeed, during the December 14, 1983 pretrial motion hearing, the matter was squarely presented to the trial court. Counsel explained:
 
 
 18
 COUNSEL: This is a very complex situation requiring a great deal of work on the part of Counsel. You are aware that I am court-appointed in this case. No expense money has been provided with which to pursue the defense of the Defendant. What funds are being used are being expended directly from my own pocket or from my firm as the case may be. We have trial commencing on January 3rd or shortly thereafter. We would like to apply to the Court for some expense money in order to continue the interview of witnesses and the preparation for trial.
 
 
 19
 You are aware that we arranged for and employed Dr. Hamilton, William Hamilton, to provide a psychiatric evaluation for Mr. Castro.[6] He and I discussed the fee situation and I told him that there was none allowed at this time. I think it is an infringement upon the Defendant's rights for us to have to predicate his defense upon the absence of any money whatsoever to pursue his defense. The State has those funds and resources available. I think it's a denial of equal protection under the law. I think it's a denial of his rights under the Federal and State Constitution.
 
 
 20
 ....
 
 
 21
 THE COURT: I know of no provision to do that, but those matters--and I will deny your Application at this time for the record, but if you feel that there is some relief that might be afforded to you under the statute, then I recommend that you make a written application to the Presiding Judge and let him consider that because those matters--I think he should be the one to rule on those matters, particularly, the way the court fund and the court budget stands at this time.
 
 
 22
 COUNSEL: I certainly understand that. You do need to know that one attorney turned down the defense of this case because he could not get expense money and Judge Doggett looked into the matter at that time--he being, for the record, the Presiding Judge--and I, therefore, think that the issue will stand with your ruling, Your Honor.
 
 
 23
 THE COURT: All right.
 
 
 24
 The record indicates no further pretrial reference to this issue.
 
 
 25
 However, the issue was again raised during trial. After the jury convicted Mr. Castro and prior to the beginning of the penalty phase, counsel explained his difficulty in presenting a viable defense because of a lack of funds. One issue he explicitly noted was his inability to afford expert psychiatric assistance.
 
 
 26
 I have earlier made application to Judge Doggett orally as to the necessity of obtaining funds in [sic] which to obtain relevant testimony to that issue of his mental state at the time these acts were, in fact, committed, and the alleged acts were committed. I was told that such funds were not available to me at the time and, in fact, Mr. Royce Hobbs declined acceptance of this case because he was not afforded that also. I certainly do not blame the Court or the system for that; it is just simply a fact. Now, I have gone to the family with requests for money, not attorney fees, but with which to secure medical testimony to develop into what I consider a very crucial statement in which the statement will, likewise, refer to as being somewhat crucial in this proceeding. The family is without funds.... Consequently, we will have a very brief Part 2 proceeding, and I apologized to Mr. Castro and I do to the Court for the situation I find myself in, but the record needs to reflect it.
 
 
 27
 Next, counsel raised the issue during his closing argument before the jury in the sentencing phase.
 
 
 28
 We do not know whether John Walter Castro can and will be the beneficiary of psychological treatment, therapy. We do not know what his life holds for him in the future. We do know that each of you with your individual vote does, in fact, hold in your hands a chance for him to benefit from what he has apparently been denied all of his life, a decent opportunity in this life to have a chance to grow up and to be a decent human being. That is not an excuse for the deaths of those two people. I wouldn't say that, and let me tell you, he has said just the opposite. He said that "That is no excuse." Those are direct words. But, you are entitled to know about this person's life. You are entitled to know that he has begged and sought counseling and guidance and psychological testing and you have heard that it was not available to him because the system did not have the money with which it could be provided under the law. You have heard that.
 
 
 29
 Finally, the expert psychiatric assistance issue was raised during counsel's request for a new trial. As one of his grounds for moving for a new trial, counsel argued:
 
 
 30
 [A] very significant thing occurred in this case, in my opinion, which was brought to the attention of the Court and which admittedly you had no control over nor did Judge Doggett based upon the statutes, but it is for that reason that I am again raising it. Between the time that Mr. Castro was examined at Vinita and the time that I had him privately examined by Dr. Hamilton, which I advised the State of and the Court, he came to me with an explanation of some difficulties that he was having concerning what happened to him when Mrs. Pappan's death occurred, and I think that perhaps had some influence on the Court in permitting him to withdraw his plea; I don't know about that, but in any event, we sought funds from Judge Doggett who is here at the time we are making these statements concerning the examination of Mr. Castro on the issue of temporary insanity. The Court, under the statute, properly denied those and I discussed it with Your Honor here and you indicated that you had no basis for granting those funds.
 
 
 31
 Mr. Castro on numerous occasions raised the point with me that he lost awareness of what he was doing and why he was doing it, and was deeply troubled by his own inability at that time to understand himself and his carryings on. I think those issues go to the emotional state of the Defendant at the time and I think it is a sad commentary that we don't have funds available. I surely hope the Court understands that I am not questioning the discretion of the Court in this case. I think you did not have discretion other than to clearly violate the laws of the State and make funds available and then raise issue of whether or not you are acting outside of the scope of authority. But I believe that this was a case in which Mr. Castro was, in fact, at that time under a tremendous amount of pressure. I think the testimony indicated it. I think that crucial time period of his life should have been carefully and professionally reviewed. Inasmuch as it wasn't, we now stand with a man who has been unable to present any testimony in regard to that.
 
 
 32
 In an affidavit filed as an attachment to Mr. Castro's habeas petition, counsel summarized these events:
 
 
 33
 Prior to trial, on numerous occasions, I asked the trial judge and the chief administrative judge of the 8th Judicial District, separately on several occasions for authorization for a proper psychological evaluation of Mr. Castro, and for an investigator, to which the State never objected. Each time the administrative judge (Judge Doggett) would state that it wanted to help me, but was unauthorized to provide the necessary funds. I then went to the trial judge (Mullins) and made the request which was denied. Even though I did hire a child psychiatrist at my own expense, his evaluation of Mr. Castro was very limited, brief and cursory. Further, the psychiatrist accepted my request to render an informal opinion on condition that he not be called to testify at trial on Mr. Castro's behalf. Consequently, the lack of funds to hire a mental health expert made it impossible for me to adequately present to the jury the full range of Mr. Castro's psychological impairments.
 
 
 34
 In addition, a substantial amount of evidence about Mr. Castro's mental capacity was discovered after his trial. In preparation of the habeas corpus petition, new counsel asked two expert mental health professionals to examine Mr. Castro. Phillip J. Murphy, Ph.D., a clinical psychologist, conducted a comprehensive psychological and neuropsychological evaluation of the petitioner. Dr. Murphy discovered:
 
 
 35
 To summarize the psychological assessment findings, Mr. Castro is suffering from a thought disorder of an encapsulated paranoid nature, with both depressive and organic features. The fact of his having had sexual intercourse with his biological mother when he was in his mid-adolescent years is an event so destructive to a male's mental health that it is unlikely that it was not an important contributor to his thought disorder. The events leading up to the homicide of Ms. Cox provide a template extremely similar to the events prior to incest between Mr. [C]astro and his mother; this understanding completes the analysis by Dr. Caldwell of Mr. Castro's action in the homicide of Ms. Cox.[7] The triggering stimulus for his having shot Ms. Cox being his view of her bare buttocks translates to his viewing them as his mother's bare buttocks and this completed the incest scenario. The similarity between his second victim, Ms. Pappan, and his mother was his statement that he was frightened of both. His fear of his mother was historic, but his fear of Ms. Pappan was irrational since [she] was already dead.
 
 
 36
 In addition, the neuropsychological assessment indicated brain damage, which Dr. Murphy described as follows:
 
 
 37
 Mr. Castro obtained an Impairment Index of .42 on his neuropsychological assessment, which places him in the brain-damaged population. Positive findings for brain damage was a positive Category Test with 81 errors, a positive Trials A deficit, a significant deficit on the LNNB Rhythm test relative to the LNNB Receptive Speech Test, deficient comparator function, and WAIS-R subtest pattern suggestive of right hemisphere deficits.
 
 
 38
 These findings suggest strongly a right frontal and possibly right temporal brain dysfunction. This type of brain dysfunction is especially predictive of murder.
 
 
 39
 Finally, Dr. Murphy summarized Mr. Castro's mental health:
 
 
 40
 Mr. Castro is suffering from a dual-diagnosis disorder. He has had significant psychiatric disability from a paranoid thought disorder, as well as probable organic brain disorder of a right frontal type. This type of set of disorders would both call into question his competency at the time of the trial, and also provide probable mitigating issues to the jury who should have had the opportunity to hear such testimony, especially if it had been explained by competent experts.
 
 
 41
 Fran St. Peter also examined Mr. Castro.[8] Ms. St. Peter specializes in conducting "social history investigation[s]" of capital murder defendants "to explain the defendant's developmental history and the links between that history with the defendant's conduct at the time of the offense."
 
 
 42
 Ms. St. Peter was critical of Mr. Castro's trial counsel's lack of preparation in establishing mitigation evidence during the sentencing phase of his trial. She concluded a "comprehensive biopsychosocial life history outline or evaluation" was necessary. Such an examination is designed to "detect the presence of significant factors such as neurological impairment; cognitive disabilities; physical, sexual or psychological abuse; substance abuse; mental disorders; or other factors which influence the development of the client's personality and behavior."
 
 
 43
 Ms. St. Peter identified five issues not raised at trial or sentencing which would have been part of her evaluation. First, the pervasive addiction to drugs and alcohol abuse among members of Mr. Castro's immediate and extended family. Second, the possibility Mr. Castro suffered from Fetal Alcohol Syndrome or Effect. Third, the male role models in Mr. Castro's life set an example of alcoholism and battery toward women. Fourth, Mr. Castro was exposed to and influenced by very aggressive, hostile, domineering women who abused drugs and alcohol. Fifth, Mr. Castro meets the diagnostic classification for Paranoid Personality Disorder. Ms. St. Peter concluded the absence of this kind of evaluation during the penalty phase deprived the jury of the ability to understand Mr. Castro's crime in the context of his entire life. Ms. St. Peter determined:
 
 
 44
 Events that occurred in John W. Castro's early years would have been directly related to his behaviors in this case by a mitigation specialist. The linking of early life experiences with adult behaviors would have provided each juror a different and broader viewpoint from which to assess the defendant's culpability in this case. The jurors were denied this opportunity as this linking was never explained to them.
 
 
 45
 The mitigation specialist, as a professional and impartial third party, would tie together the specific incidents of John W. Castro's life and interpret them so as to provide the jurors a cohesive picture of the life that he lived. The jurors never received this picture of John W. Castro's life as no one presented this evidence to them.
 
 II.
 
 46
 In reviewing the district court's denial of Mr. Castro's habeas corpus petition, we review the court's factual findings under the clearly erroneous standard and its legal conclusions de novo. Brewer v. Reynolds, 51 F.3d 1519, 1522 (10th Cir.1995); Thomas v. Kerby, 44 F.3d 884, 887 (10th Cir.1995).
 
 A. PROCEDURAL ISSUES
 
 47
 Before addressing the substance of Mr. Castro's expert psychiatric assistance claim, we must first dispose of the State's procedural arguments pertaining to the issue.
 
 
 48
 First, the State argues Dr. Murphy's and Ms. St. Peter's expert affidavits are newly discovered evidence which may not be considered. Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). In Herrera, the Court held newly discovered evidence of actual innocence could not be presented in the habeas corpus context. The Court focused on the issue of factual errors in the state court proceedings because Mr. Herrera's claim of innocence was premised on the factual allegation his now-deceased brother actually committed the crime. The Court's decision was based on the long-standing principle that, "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution--not to correct errors of fact." Id. at 400, 113 S.Ct. at 860 (citing Moore v. Dempsey, 261 U.S. 86, 87-88, 43 S.Ct. 265, 265, 67 L.Ed. 543 (1923) (Holmes, J.); Hyde v. Shine, 199 U.S. 62, 84, 25 S.Ct. 760, 764, 50 L.Ed. 90 (1905); Ex parte Terry, 128 U.S. 289, 305, 9 S.Ct. 77, 79, 32 L.Ed. 405 (1888)). The Court further explained:
 
 
 49
 Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.
 
 
 50
 Id. (quoting Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963) (emphasis in original)).
 
 
 51
 Unlike Mr. Herrera, Mr. Castro has alleged a constitutional violation of the Fourteenth Amendment's Due Process Clause. Dr. Murphy's and Ms. St. Peter's affidavits support his constitutional claim, not a factual claim of actual innocence. Therefore, Herrera's rule barring the introduction of newly discovered evidence in a habeas proceeding does not apply.
 
 
 52
 Second, the State asserts considering Dr. Murphy's and Ms. St. Peter's affidavits would institute a new rule of constitutional law which cannot be announced or applied on collateral review. Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion).[9] The State relies upon Harris v. Vasquez, 949 F.2d 1497, 1516-22 (9th Cir.1990), cert. denied, 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992), in support of its argument. This reliance is seriously misplaced.
 
 
 53
 In Harris, the Ninth Circuit considered whether "the competence of defendant-selected psychiatric assistance may be tested by subsequent review of its substance in a federal habeas corpus proceeding" was a new rule under Teague. Harris, 949 F.2d at 1518. During his capital trial Mr. Harris received the assistance of two psychiatrists chosen by his defense counsel and paid for by the State of California. Id. at 1516. He sought to challenge the competency of the psychiatric assistance he received. The court rejected his claim on two grounds. First, the court concluded Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), only required access to psychiatric assistance, not a review of the competency of the psychiatric assistance actually received. Harris, 949 F.2d at 1517-18.[10] Second, the court held the rule Mr. Harris asked it to apply was a new rule of constitutional law under Teague and neither of Teague's two exceptions applied. Id. at 1518-22.
 
 
 54
 Harris may be distinguished from the instant case in two principle ways. First, the consideration of Mr. Castro's Ake claim does not implicate Teague. Ake was decided by the Supreme Court on February 26, 1985, while Mr. Castro's conviction did not become final until the Supreme Court denied certiorari on March 21, 1988. Accordingly, applying Ake here does not present a retroactivity problem because Mr. Castro's case had not yet become final. In Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Court held, "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Id. at 328, 107 S.Ct. at 716. We have previously applied Griffith to an Ake claim. Liles v. Saffle, 945 F.2d 333 (10th Cir.1991), cert. denied, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992). In Liles, we concluded "[b]ecause the United States Supreme Court decided Ake while petitioner's direct appeal was pending, this case does not present a retroactivity issue." Id. at 335 n. 2. No retroactivity problem exists here either.
 
 
 55
 Second, unlike Harris, Mr. Castro never received the State's monetary assistance in securing a competent psychiatric expert to assist in his defense. Mr. Castro is not challenging the competency of a state-funded psychiatrist. Instead, he argues the State failed in its duty under Ake to provide him with the required expert psychiatric assistance.[11] Harris' analysis is therefore not applicable.
 
 
 56
 Finally, the State argues Mr. Castro has expanded his allegations concerning Dr. Hamilton's alleged incompetence beyond what was raised before the district court. The State correctly notes our general rule that we will not consider an argument on appeal not presented to the district court. Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1539 (10th Cir.1995). However, the rule is inapposite here. Mr. Castro has previously presented to the district court his argument Dr. Hamilton was not qualified to provide him expert psychiatric assistance. Therefore, our consideration of this issue is not barred.
 
 B. EXPERT PSYCHIATRIC ASSISTANCE
 
 57
 Mr. Castro argues the state trial court denied him due process by failing to grant his request for funds for an expert psychiatrist to assist him in both phases of his trial. Mr. Castro contends he met the requisite threshold showing under Ake requiring the appointment of a psychiatrist at the State's expense.
 
 
 58
 In Ake, the Court announced due process requires the states to provide indigent criminal defendants with expert psychiatric assistance under certain circumstances. The Court held:
 
 
 59
 [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.
 
 
 60
 Ake, 470 U.S. at 83, 105 S.Ct. at 1096. The same term, the Court clarified that a criminal defendant must offer "more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2636 n. 1, 86 L.Ed.2d 231 (1985). We have elaborated on the Ake standard as follows:
 
 
 61
 If sanity or mental capacity defenses [are] to be defense issues, they must be established by a clear showing by the indigent defendant as genuine, real issues in the case. In order for a defendant's mental state to become a substantial threshold issue, the showing must be clear and genuine, one that constitutes a close question which may well be decided one way or the other. It must be one that is fairly debatable or in doubt.
 
 
 62
 Liles, 945 F.2d at 336 (quoting Cartwright v. Maynard, 802 F.2d 1203, 1211 (10th Cir.1986), rev'd on other grounds, 822 F.2d 1477, 1478 n. 2 (10th Cir.1987) (en banc), aff'd 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (quotation marks omitted)); United States v. Sloan, 776 F.2d 926, 928-29 (10th Cir.1985).
 
 
 63
 Additionally, the Court held a capital defendant may be entitled to psychiatric assistance during the sentencing phase of his trial. If the defendant makes the necessary threshold showing, "due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." Ake, 470 U.S. at 84, 105 S.Ct. at 1096. Expert psychiatric assistance is required "when the State presents psychiatric evidence of the defendant's future dangerousness." Id. at 83, 105 S.Ct. at 1096. However, we have explicitly "rejected a narrow construction of Ake." Brewer, 51 F.3d at 1529. In Liles, we held the State's presentation of expert psychiatric evidence at sentencing was not a prerequisite to triggering its Ake duty. Liles, 945 F.2d at 340-41. An expert must be appointed if the State presents evidence, psychiatric or otherwise, of the defendant's future dangerousness or continuing threat to society during the sentencing phase, and the indigent defendant establishes the likelihood his mental condition is a significant mitigating factor. Brewer, 51 F.3d at 1529; Liles, 945 F.2d at 340-41.
 
 
 64
 For cases such as this one, where Ake was decided after trial but while direct appeal was pending, our inquiry differs. In such cases, "the question presented is whether, 'upon review of the entire record, [petitioner] could have made a threshold showing under Ake that 'his sanity at the time of the offense is to be a significant factor at trial....' " Liles, 945 F.2d at 336 (quoting Cartwright, 802 F.2d at 1212) (alteration and emphasis in original). This reformulated standard also applies to determinations whether due process requires the state-funded appointment of expert psychiatric assistance during the sentencing phase.
 
 
 65
 Although Mr. Castro argues his mental condition was a significant factor during both the guilt/innocence and sentencing phases of his trial, we have chosen only to address his Ake claim at sentencing. The district court concluded Mr. Castro failed to make the threshold showing required by Ake for the guilt/innocence phase of his trial. The court reasoned:
 
 
 66
 In this case there was some evidence available to the trial court arguably suggestive of some mental or emotional disturbance. This evidence is scant at best, however, and is not sufficient to make the requisite showing that the Petitioner's sanity at the time of the offense was likely to be a significant factor in his defense.
 
 
 67
 We agree with the district court's conclusion.
 
 
 68
 The district court only briefly discussed Mr. Castro's sentencing phase Ake claim. The court concluded no expert psychiatrist needed to be appointed because, "although the state asserted the 'continuing threat' aggravator, the state did not offer psychiatric evidence in the penalty phase of the Petitioner's trial to support this aggravator."
 
 
 69
 Mr. Castro's "strategy at the sentencing phase was to argue that his diminished capacity and family background rendered him less morally culpable than a person of ordinary intelligence with a normal background. He thus hoped to be spared the death penalty." Starr v. Lockhart, 23 F.3d 1280, 1287 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994). In furtherance of this strategy, Mr. Castro and his great aunt, Ms. Tucker, testified on his behalf. Both described the distinctly troubled nature of his childhood and adolescence. However, neither could frame the existing mitigating evidence in nearly as coherent a fashion as Ms. St. Peter presumably could have done. Ms. St. Peter's affidavit describes significant emotional and development impairments which directly pertain to Mr. Castro's relative culpability for murder. Her expertise would have allowed her to relate past instances from Mr. Castro's childhood to his crime. The picture she paints of Mr. Castro in her affidavit is distinctly different from the picture painted by the cold, hard facts of Ms. Pappan's murder.
 
 
 70
 Furthermore, Dr. Murphy's testimony would likely have been even more crucial to Mr. Castro during the sentencing phase. Dr. Murphy's affidavit describes a man with significant mental, emotional, and psychological problems as well as severe brain damage. Accordingly, along with Ms. St. Peter's testimony, Dr. Murphy could have placed Mr. Castro's crime in an altogether different and appropriate context. Dr. Murphy's psychological assessment goes beyond an allegation that Mr. Castro has lived a difficult and troubled life. It lends significant credence to Mr. Castro's blind assertion he murdered Ms. Pappan because there was something wrong with his mind. We conclude if Mr. Castro's psychological and emotional profile can in any way be said to have caused him to murder Ms. Pappan, as we believe it can, the jury should have heard an expert presentation of this mitigating evidence during sentencing. Otherwise, the jury could not properly consider all of the individualized circumstances required in deciding whether Mr. Castro deserved to live or die. See generally Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982) (describing the crucial sentencing phase focus on the individual defendant's particularized characteristics); Woodson v. North Carolina, 428 U.S. 280, 303-04, 96 S.Ct. 2978, 2990-91, 49 L.Ed.2d 944 (1976) (joint opinion of Justices Stewart, Powell and Stevens) (same); Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (joint opinion of Justices Stewart, Powell and Stevens) (same).
 
 
 71
 In support of its contrary decision, the district court conclusively relied upon the fact the State did not present psychiatric evidence against Mr. Castro. However, we explicitly foreclosed such reasoning in Liles. There, we held the State's offering psychiatric evidence was not a prerequisite to the need for expert assistance during sentencing. Liles, 945 F.2d at 340-41. The Ake duty was triggered here by the State's presentation of any evidence of Mr. Castro's future dangerousness or continuing threat to society. Id. We reiterate our earlier conclusion from Liles. There is no necessity for the State to offer psychiatric testimony or evidence during the sentencing phase of a capital trial for its Ake duty to apply. As long as the State offers evidence of the defendant's future dangerousness or continuing threat to society, Ake applies with full force.[12]
 
 
 72
 In turn, the State stresses the manner Mr. Castro's trial counsel requested expert psychiatric assistance. The State argues counsel merely asked for funds to reimburse Dr. Hamilton for the examination he already had performed. The State asserts counsel never requested expert psychiatric assistance for either phase of Mr. Castro's trial other than to request Dr. Hamilton be paid.
 
 
 73
 We disagree. We believe the record reflects counsel made a generalized request for expert psychiatric assistance beyond merely asking for state funding to reimburse Dr. Hamilton for his services. We reach this conclusion based on counsel's repeated focus on this issue as we have already detailed. Taken in its entirety, the record reflects counsel's concern with securing expert psychiatric assistance during both stages of Mr. Castro's trial. While the State is correct that counsel's concern often focused on securing funds to reimburse Dr. Hamilton for his services, we do not believe this represented the totality of his request. Counsel noted repeatedly before, during, and after trial, that his ability to properly defend Mr. Castro was severely limited by a lack of funds for expert psychiatric assistance. These requests were sufficient to squarely present the issues Ake is concerned with in this case.
 
 
 74
 In addition, both the State and the district court rely on the fact Mr. Castro received Dr. Hamilton's assistance. The district court determined Dr. Hamilton provided competent psychiatric assistance to the defense. The court held, "[a]lthough the Petitioner was denied state funds with which to pay for psychiatric assistance, he was not denied the benefit of such assistance." The State asserts any detriment the lack of funds caused Mr. Castro was mitigated by Dr. Hamilton's assistance. Again, we disagree.
 
 
 75
 We believe a serious question whether Dr. Hamilton was competent to provide expert psychiatric assistance exists. Dr. Hamilton's specialties in child and geriatric psychiatry probably render him unqualified to offer an expert opinion on many of the issues raised in a capital murder trial. A forensic psychiatrist or psychologist is the proper specialist for such a task.
 
 
 76
 Nevertheless, we do not decide this issue based on Dr. Hamilton's competency because there is a more telling problem with his assistance. Dr. Hamilton's refusal to testify on Mr. Castro's behalf in and of itself makes his assistance inadequate. In explicating the right to expert psychiatric assistance at sentencing, the Court in Ake specifically noted part of the expert's role included taking the stand. Ake, 470 U.S. at 84, 105 S.Ct. at 1096. Dr. Hamilton's informal agreement with counsel specifically included a stipulation he would not be called to testify. Accordingly, Dr. Hamilton's assistance cannot be considered a viable substitute.
 
 
 77
 Therefore, we believe Mr. Castro has "established the likelihood that his mental condition could have been a significant mitigating factor," Liles, 945 F.2d at 341, as required by Ake. As a result, we hold the district court erred in concluding due process did not require the appointment of an expert psychiatrist during the sentencing phase of Mr. Castro's trial.
 
 C. HARMLESS ERROR ANALYSIS
 
 78
 Finally, we must determine whether Mr. Castro's lack of expert psychiatric assistance at sentencing was harmless error.[13] Recently, we held "the denial of a psychiatric expert in violation of Ake is 'trial error,' and thus, subject to harmless-error analysis." Brewer, 51 F.3d at 1529 (quoting Starr, 23 F.3d at 1291-92). We applied the Kotteakos harmless-error standard, asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Id. (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946) and citing Brecht v. Abrahamson, 507 U.S. 619, ----, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)).[14]
 
 
 79
 We conclude the trial court's denial of Mr. Castro's request for funds for an expert psychiatrist was not harmless. First, during its deliberations the jury sent a note out to the trial court. The note asked: "Exactly what is meant by a life sentence? (We didn't understand 999 years as stated by Mr. Wideman)."[15] The court responded: "You may assess a specific number of years but not less than the minimum, or you may specify life." We believe this colloquy demonstrates the jury conscientiously followed its charge in determining Mr. Castro's appropriate punishment. The jury's question at least indicates it was not self-evident to the jury whether Mr. Castro's crime warranted the death penalty.
 
 
 80
 Second, unlike Brewer, the State presented evidence of Mr. Castro's continued threat to society. In Brewer, we reasoned the rationale for an expert psychiatrist at sentencing disappeared "when the State did not pursue the continuing threat aggravator at sentencing." Brewer, 51 F.3d at 1530. As we outlined above, the State's reliance on the continuing threat aggravating circumstance in this case directly placed Mr. Castro's mental status at issue.
 
 
 81
 Third, and most importantly, on direct review the Oklahoma Court of Criminal Appeals struck down the especially heinous, atrocious and cruel aggravating circumstance on insufficient evidence grounds. The court's holding means an appellate court's reweighing the evidence presented at sentencing--as we must in conducting harmless-error review--cannot consider any evidence presented by the State to demonstrate the applicability of this aggravator. Mr. Castro's death sentence stands or falls on weighing the continuing threat aggravating circumstance evidence against any mitigating evidence. Mr. Castro's Ake claim is that he was prevented from presenting all the available mitigating psychological evidence. The combination of these two circumstances alters the balance by decreasing the relative weight of the aggravating evidence while simultaneously increasing the weight of the mitigating evidence. Under these circumstances, we cannot say Mr. Castro's inability to present relevant psychological evidence during the sentencing phase of his trial was harmless.
 
 
 82
 Our harmless error inquiry in this case may be framed in its starkest terms by inquiring, "Do [we] harbor a significant doubt that this evidence would have caused at least one juror to choose life rather than death?" Brecheen v. Reynolds, 41 F.3d 1343, 1373 (10th Cir.1994) (Ebel, J., dissenting), cert. denied, --- U.S. ----, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995). The defense's strategy during the sentencing phase was to admit Mr. Castro's guilt but to argue he was not sufficiently morally culpable to warrant a death sentence. Admittedly, it is difficult to differentiate between various classes or kinds of murder in terms of moral culpability. No grand scale in this world exists to systematically compare the atrocities of various murderers. However, each of us has a largely intuitive sense of the moral blameworthiness of different criminal actions. We retain substantial doubt that no member of the jury would have decided not to impose a death sentence if Mr. Castro had been able to present mitigating psychiatric testimony during the sentencing phase of his trial. We conclude the facts and circumstances of Mr. Castro's crime, coupled with a more complete picture of his mental health, likely would have changed the jury's intuitive calculus. Accordingly, we hold the error was not harmless.III.
 
 
 83
 The district court's order denying the writ of habeas corpus is AFFIRMED IN PART AND REVERSED IN PART. The case is REMANDED to the district court to grant the writ on the ground petitioner's death sentence is invalid under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The court shall stay the writ for ninety days following the date of this opinion to allow the State to elect whether to hold a new sentencing trial during which petitioner shall be provided with expert psychiatric assistance in accordance with this opinion, or resentence petitioner in accordance with Oklahoma law.
 
 
 84
 The mandate shall issue forthwith.
 
 
 
 [1]
 On direct appeal, Mr. Castro's robbery conviction was vacated on double jeopardy grounds because it was the predicate offense for his felony-murder conviction. Castro v. State, 745 P.2d 394, 405 (Okla.Crim.App.1987). However, both Mr. Castro's felony-murder conviction and his subsequent death sentence were affirmed. Id. at 410. Mr. Castro's petition for rehearing was denied, Castro v. State, 749 P.2d 1146 (Okla.Crim.App.1987), cert. denied, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988), as were his two applications for state post-conviction review. See Castro v. State, 814 P.2d 158 (Okla.Crim.App.1991), cert. denied, 502 U.S. 1063, 112 S.Ct. 947, 117 L.Ed.2d 116 (1992); Castro v. State, 871 P.2d 433 (Okla.Crim.App.1994). The district court concluded, and we agree, Mr. Castro has exhausted his state remedies
 
 
 [2]
 Mr. Castro raised five substantive issues on appeal. The four additional issues we leave unaddressed in this opinion are: (1) the effectiveness of Mr. Castro's counsel due to his alleged failure to consider, prepare, or present available evidence concerning Mr. Castro's mental health; (2) the trial court's decision to exclude potential mitigating evidence during the sentencing phase in the form of a presentence report prepared prior to Mr. Castro's withdrawal of a guilty plea; (3) the Oklahoma Court of Criminal Appeals' ability to reweigh the aggravating circumstances against the mitigating evidence after striking down one of the two aggravating factors found by the jury; and, (4) the constitutionality of the continuing threat aggravating circumstance as applied for failing to provide any guidance to the jury in the exercise of its discretion in imposing the death penalty. We explicitly offer no opinion concerning the merits of these claims
 
 
 [3]
 In Oklahoma, like most states, a capital trial is divided into two phases. First, the jury determines whether the defendant is guilty. Second, upon a finding of guilt, the jury must determine whether to impose a death sentence. Okla.Stat.Ann. tit. 21, Sec. 701.10 (West 1995). Oklahoma is a weighing state. Accordingly, the jury must find the existence of at least one aggravating factor beyond a reasonable doubt and then must conclude the aggravating circumstance or circumstances outweigh any mitigating evidence presented by the defendant before it may recommend a death sentence. Okla.Stat.Ann. tit. 21, Sec. 701.11-12 (West 1995)
 
 
 [4]
 After his incarceration for Ms. Pappan's murder, Mr. Castro confessed to murdering Beulah Grace Cox on April 18, 1983. Subsequent to his trial for murdering Ms. Pappan, Mr. Castro was convicted of this crime and received a sentence of death. The Oklahoma courts have considered and denied his direct appeal and one petition for post-conviction relief. See Castro v. State, 844 P.2d 159 (Okla.Crim.App.1992), cert. denied, --- U.S. ----, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); Castro v. State, 880 P.2d 387 (Okla.Crim.App.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1375, 131 L.Ed.2d 229 (1995)
 
 
 [5]
 In an affidavit attached to Mr. Castro's habeas petition, Dr. Petrick described the hospital's policy not to report disagreements among treatment team members in competency determinations to the courts
 
 
 [6]
 Dr. William Hamilton, a psychiatrist, whose specialties are child and geriatric psychiatry, agreed to examine Mr. Castro because of his personal friendship with counsel. However, he refused to testify on Mr. Castro's behalf in either phase of the trial
 
 
 [7]
 Dr. Henry Steven Caldwell, a clinical psychologist, testified as a defense expert witness during Mr. Castro's trial for murdering Ms. Cox
 
 
 [8]
 Ms. St. Peter is a Registered Nurse, Licensed Master Social Worker--Advanced Clinical Practitioner, Certified Chemical Dependency Specialist, and Licensed Chemical Dependency Counselor. Ms. St. Peter works as a psychotherapist, forensic social worker and mitigation specialist
 
 
 [9]
 In Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Court clarified the appropriate retroactivity analysis for habeas corpus cases, subsequently noting the rule also applied to capital cases. Penry v. Lynaugh, 492 U.S. 302, 313-14, 109 S.Ct. 2934, 2943-44, 106 L.Ed.2d 256 (1989). Ordinarily, a new rule, defined as one that "breaks new ground or imposes a new obligation on the States or the Federal Government," will not be applied in the collateral context. Teague at 301, 109 S.Ct. at 1070. The Court adopted two exceptions to this rule. First, a new rule should be applied retroactively, "if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.' " Id. at 311, 109 S.Ct. at 1075 (quoting Mackey v. United States, 401 U.S. 667, 692, 91 S.Ct. 1171, 1179, 28 L.Ed.2d 404 (1971) (Harlan, J., opinion concurring in part and dissenting in part). Second, when it involves a "watershed rule of criminal procedure," implicating the "fundamental fairness of the trial," and "that is implicit in the concept of ordered liberty." Id. at 312-14, 109 S.Ct. at 1076-77. Neither of these two exceptions are at issue in the instant case
 
 
 [10]
 The court pointedly characterized the relief sought by Mr. Harris: "Rather, Harris asks this court to apply a constitutional rule that would require federal courts to conduct a 'psychiatric medical malpractice review' in a federal habeas proceeding to determine whether a state prisoner's psychiatrists 'competently' assisted the defense." Harris v. Vasquez, 949 F.2d 1497, 1518 (9th Cir.1990), cert. denied, 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992). In Harris, the court followed a similar decision of the Seventh Circuit. Silagy v. Peters, 905 F.2d 986, 1013 (7th Cir.1990), cert. denied 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). Compare State v. Sireci, 536 So.2d 231, 232 (Fla.1988) ("We must warn that a subsequent finding of organic brain damage does not necessarily warrant a new sentencing hearing. However, a new sentencing hearing is mandated in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage." (citations omitted)); State ex rel Prejean v. Whitley, 560 So.2d 447 (La.) (Dennis, J., dissenting) ("In my opinion, it cannot be determined from this record whether Prejean was denied competent psychiatric assistance.... In the present application, the relator for the first time makes a substantial showing, with affidavits from other psychologists, that the psychologist provided by the state did not function as a competent expert because he did not determine Prejean's history, conduct sufficient tests, or recognize and follow up on signs of his brain damage"), cert. denied, 495 U.S. 943, 110 S.Ct. 2200, 109 L.Ed.2d 527 (1990)
 
 
 [11]
 Mr. Castro does challenge Dr. Hamilton's capability and competence to provide expert psychiatric assistance in his case. Mr. Castro argues Dr. Hamilton's training as a child and geriatric psychiatrist renders him unqualified in the necessary specialty of forensic psychiatry. However, Mr. Castro's contentions concerning Dr. Hamilton differ from Mr. Harris' argument rejected by the Ninth Circuit. Mr. Castro is responding to the State's assertion the question of whether it violated Ake must be resolved by examining the psychiatric assistance Mr. Castro actually received from Dr. Hamilton. Unlike Mr. Harris, he is not taking issue with the substantive testimony of a psychiatrist provided by the State to assist in his defense. This represents a dispositive distinction between the two cases. Harris is concerned with the substantially broader issue of whether a capital defendant may challenge the competency of a state-funded psychiatrist in similar fashion as he may challenge the effectiveness of his legal representation. Mr. Castro's allegations about Dr. Hamilton do not raise the spectre of "psychiatric medical malpractice review" which so concerned our sister circuit. See Harris, 949 F.2d at 1518
 
 
 [12]
 Mr. Castro also argues the "especially heinous, atrocious or cruel" aggravating circumstance placed his mental condition at issue at sentencing. We have recently rejected this argument. Brewer v. Reynolds, 51 F.3d 1519, 1531 (10th Cir.1995) ("The Oklahoma Court of Criminal Appeals has construed the heinous, atrocious, and cruel aggravator in such a manner such that it does not implicate a defendant's mental condition.")
 
 
 [13]
 See Tuggle v. Netherland, --- U.S. ----, ----, 116 S.Ct. 283, 285, 133 L.Ed.2d 251 (1995)
 
 
 [14]
 In so doing, we rejected the Eighth Circuit's prior application of the harmless-error standard from Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) ("harmless beyond a reasonable doubt") to this context. Starr v. Lockhart, 23 F.3d 1280, 1291-92 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994)
 
 
 [15]
 Mr. Wideman was the prosecutor in Mr. Castro's trial