**Lawrence Duane CHRISTY, Petitioner,**

v.

**Martin F. HORN, Commissioner, Pennsylvania Department of Corrections; Ben Varner, Superintendent, State Correctional Institution at Greene; and Robert Meyers, Acting Superintendent, State Correctional Institution at Rockview, Respondents.**

**Civil Action No. 96–37J.**

United States District Court,
W.D. Pennsylvania.

Nov. 10, 1998.

See also, 515 A.2d 832.

W. Thomas McGough, Jr., John C. Unkovic, Pamina Ewing, Eric Chaffin, Pittsburgh, PA, for petitioner.

Christian A. Fisanick, Barnesboro, PA, for respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZIEGLER, Chief Judge.

Pending before the court is the motion of petitioner, Lawrence Duane Christy, for habeas corpus relief pursuant to 28 U.S.C. § 2254.[1] Petitioner alleges that a habeas writ should issue for the following reasons: (1) the state court trial judge failed to appoint a psychiatrist to assist the defense and violated plaintiff's due process rights; (2) trial counsel was ineffective in violation of the Sixth Amendment; (3) the prosecution violated plaintiff's right to a fair trial by making false and inflammatory arguments to the jury; and (4) the trial court erroneously instructed the jury. An evidentiary hearing was conducted in this court on March 3, 1998, and Christy presented evidence, argument, and the testimony of Caroline Roberto, Esquire. Roberto is an able and experienced criminal defense lawyer who practices extensively in federal and state court. She qualified as an expert witness and expressed various opinions. The respondents presented no evidence beyond the record of the state court proceedings. Based on the credible evidence of record and the testimony adduced at the hearing, the parties' joint appendix, and the submissions of the parties, the following shall constitute findings of fact and conclusions of law.

## I. FACTS & PROCEDURAL HISTORY

1. Petitioner, Lawrence Duane Christy, is an incarcerated individual, under judgment of sentence of death, at the State Correctional Institution at Greene County, Pennsylvania.

2. From 1973 through 1979, while incarcerated for other crimes, Christy was involuntarily committed to various mental health institutions in the Commonwealth because of mental illness.[2]

3. Specifically, numerous medical documents of record establish that Christy suffered from, *inter alia*, schizophrenia, organic brain syndrome, depression, paranoid schizophrenia, personality disorder, psychosis, delusions, and long-term drug and alcohol addiction.[3]

4. In November 1977, Cambria County Mental Health Review Officer Dennis McGlynn, Esquire, presided over Christy's involuntary commitment proceeding.[4] McGlynn subsequently joined the Office of District Attorney of Cambria County, Pennsylvania, and prosecuted Christy in the proceedings that underly the instant habeas petition.

5. The Honorable Eugene A. Creany, who served as the state court judge in Christy's capital case, also presided at several of Christy's commitment hearings.

6. In June of 1978, McGlynn again reviewed Christy's medical evaluations with respect to an involuntary commitment, and concluded that Christy was "actively psychotic." Another commitment hearing was held in September 1978, as ordered by Judge Creany, which resulted in petitioner's recommitment to Farview State Hospital. The basis for the recommitment, according to

---

1. Because Christy's petition was filed prior to April 24, 1996, we will employ the standards applicable before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996. *See Lindh v. Murphy*, 521 U.S. 320, ———, 117 S.Ct. 2059, 2063–64, 138 L.Ed.2d 481 (1997); *Henderson v. Frank*, 155 F.3d 159, 163 (3d Cir.1998).

2. Christy was committed to Norristown State Hospital in 1973, Farview State Hospital during 1974 and 1977–1979, Hollidaysburg State Hospital in 1975, and Mayview State Hospital during 1979.

3. At the age of thirteen, while committed to the Boys Industrial Home of Western Pennsylvania, Christy began abusing drugs. During that time, he became addicted to amphetamines. This substance abuse continued through and beyond the night of the Volk murder.

4. From November 1977 to June 1979, McGlynn recommended that Christy should be involuntarily committed due to depressive reaction, organic brain syndrome, latent schizophrenia, personality disorder, and because Christy was actively psychotic.

McGlynn, was, *inter alia,* "suicidal schizophrenia." [5]

7. On July 23, 1979, Christy was ordered transferred to Mayview State Hospital.

8. In November 1979, Christy was released from Mayview to a halfway house in Johnstown, Pennsylvania, where he remained until his release in March 1980.

9. During the early hours of June 16, 1980, after ingesting "speed," Christy broke into the Oriental Ballroom in Gallitzen, Pennsylvania, where he encountered the night watchman, James Volk. Upon discovering Christy, Volk shot petitioner in the left wrist. Apparently unaware that Christy's wound was superficial, Mr. Volk placed his gun on the bar and began walking away. Christy stood up, grabbed the gun and shot Mr. Volk, as he rushed towards him. Christy then shot Volk in the head while the victim was crouched on the floor.

10. According to Christy's confession and subsequent trial testimony, he fired the fatal shot into Mr. Volk's "head because to me I felt that he was dying and I didn't want ... to me he was suffering."

11. In March of 1983, while on trial for unrelated assault charges in the Court of Common Pleas of Cambria County, Christy confessed to killing Mr. Volk.[6]

12. The presiding judge at the homicide trial, Honorable Eugene A. Creany, appointed Mark Parseghian, Esquire, to represent Christy in the capital case. Parseghian had represented Christy in the unrelated assault case. The attorney, who had graduated from law school three years earlier, informed the court that he had never tried a capital case. Parseghian subsequently obtained the assistance of Christopher Rulis as co-counsel. Mr. Rulis had graduated from law school two years earlier and had never tried *any* criminal cases.

13. Christy attempted to secure more experienced counsel without avail. Trial counsel also voiced concerns to the court regarding representation of Christy in the homicide case because of, *inter alia,* their limited experience and the fact that neither attorney had ever tried a capital case. Notwithstanding pleas from Christy and trial counsel, the trial judge declined to appoint more experienced counsel.

14. The prosecutors in the homicide trial were Patrick Kiniry and Dennis McGlynn, the former Mental Health Review Officer for Cambria County, who had recommended the involuntary commitment of Christy to state mental hospitals after reviewing Christy's medical records.

15. Prior to the homicide trial, the court ordered a hearing to determine whether Christy was competent to stand trial, his sanity at the time of the offense, and the voluntariness of his confession.

16. Defense counsel sought a psychiatric examination based on Christy's extensive psychiatric history at various state mental hospitals, and their desire to assert an insanity defense.[7] Counsel further noted that such an evaluation was essential to prepare an adequate defense.

17. The trial court declined to appoint a defense psychiatrist for Christy. Rather, the court initially appointed Dr. J. Edward Olivier, who evaluated Christy on behalf of the court. After reviewing medical records and interviewing Christy, Dr. Olivier concluded that Christy was not suffering from mental illness; rather, his "characterologic and personality problems are severe and are considered totally resistant to modifications through any known form of treatment." Olivier further opined that "Christy's descriptions of his crimes indicate that he clearly knew exactly what he was doing, knew the nature and quality of his acts, and knew they were wrong."

---

5. On March 19, 1979, Christy was recommitted to Farview pursuant to the order of Judge Creany.

6. Christy also confessed to killing Tom Irwin, an alleged drug dealer. The instant petition relates solely to the conviction and death sentence for the Volk murder.

7. In Christy's Omnibus Pre–Trial Motion for Relief, defense counsel noted that they intended to pursue an insanity defense and that psychiatric assistance was required.

18. During the Fall of 1983, apparently because Dr. Olivier was unavailable to appear in court, the trial judge appointed Dr. Hugh Chavern to examine Christy and advise the court as to Christy's mental condition. After interviewing Christy, but without reviewing his medical records,[8] Dr. Chavern failed to reach a conclusion as to whether Christy was able to form the specific intent required for first degree murder. Further, Chavern did not evaluate Christy's mental state with respect to mitigation. Rather, Chavern, who merely provided conclusory answers to the seven questions propounded by the court, noted that Christy stated that "I am possessed—I believe God is Lucifer—he told me to kill the second one." This statement, according to Chavern, did "not constitute a delusion and no delusional thought is noted in the rest of the interview material."

19. On November 14, 1983, the trial judge held a competency hearing, at which Dr. Chavern testified. Chavern, who rejected the diagnoses of schizophrenia,[9] testified that Christy was competent to stand trial and was not legally insane at the time of the offense. Dr. Chavern conceded that Christy had "the characteristics of an antisocial personality disorder," and that an evaluation performed near the time of the offense would more likely have reflected Christy's mental state at the time of the offense.

20. Defense counsel failed to cross-examine Dr. Chavern with respect to a diminished capacity defense or the psychiatric mitigating circumstances recognized under Pennsylvania law.[10]

21. In an effort to rebut Dr. Chavern's testimony, defense counsel sought to introduce Christy's medical records. The prosecutors objected and the trial court ruled that, absent testimony from the persons who prepared the records, the records documenting Christy's mental illness would not be admitted as evidence.

22. Defense counsel failed to contact any of the physicians who had prepared petitioner's medical records because they "had no familiarity with psychiatrists in Philadelphia or Pittsburgh or Harrisburg or anywhere else." App. 1, Tab E at 44.

23. After the competency hearing, the trial judge issued the following findings: (1) Christy was competent to stand trial; (2) petitioner was sane at the time of the offense; and (3) Christy was competent at the time that he confessed to the crime.

24. The parties proceeded to trial before a jury.

25. Trial counsel presented two defenses: (1) Christy was suffering from diminished capacity and therefore lacked the specific intent to kill as required for first degree murder; and (2) petitioner acted in self-defense.

26. In pursuing the diminished capacity defense, defense counsel failed to present any psychiatric testimony and failed to present any medical evidence or testimony from Christy's treating physicians. Further, trial counsel failed to offer Christy's medical records as evidence, apparently because Dr. Chavern had found that Christy was competent to stand trial and sane at the time of the offense. Instead, counsel sought to introduce this evidence through Christy's testimony.

27. The prosecution, through McGlynn, knowing that the arguments were less than accurate, informed the jury that if Christy actually were suffering from "some unknown, unnamed mental illness [that] reduced his mental capacity[,]" petitioner could have called doctors to testify on his behalf. The prosecution further argued that "if that testimony was available you would have heard,

8. Dr. Chavern reviewed Christy's medical records for the first time on the morning of November 14, 1983, i.e., the date of Christy's competency hearing.

9. A "patient's history is essential for the diagnosis of schizophrenia." Harold I. Kaplan, M.D. et al., *Synopsis of Psychiatry* 476 (7th ed.1994)

10. Caroline Roberto, Esquire, testified in this court that counsel should have cross-examined Dr. Chavern with regard to the diminished capacity defense that they pursued at trial, and should have questioned him regarding psychiatric mitigating circumstances recognized under Pennsylvania law. Roberto concluded that failure to do so was ineffective assistance of counsel.

but you didn't hear it; therefore, you can logically draw the assumption that he is medically and mentally fit; more importantly, responsible for his actions." App. 4, Tab L at 55–56.

28. Because defense counsel failed to produce the medical testimony from Christy's physicians, the jury never learned that McGlynn had compiled records that specifically identified Christy's mental illnesses as "active psychosis," "schizophrenia," and "organic brain syndrome."

29. While the prosecution made arguments regarding Pennsylvania law and the lack of evidence corroborating Christy's mental illness, defense counsel failed to object because "[o]n one of the prior occasions when I did object to the statements of another member of the District Attorney's staff during a closing, the Court—not specifically this Judge, but one of the members of the local bench expressed their displeasure at my having the effrontery to do so." App. 1, Tab E at 29.

30. Further, trial counsel failed to object to questions regarding Christy's prior incarcerations. Indeed, defense counsel elicited such evidence from Christy on direct examination, and on cross-examination of Mr. De-Rose, a prosecution witness. *See, e.g.,* App. 1, Tab E at 23, 51–52. Defense counsel also failed to object to the prosecutor's arguments that Christy cycled back and forth between prison, mental health facilities and the streets. According to counsel, this was an accurate description of the events.

31. On December 8, 1983, a jury convicted Christy of first degree murder for the murder of James Volk.

32. Although defense counsel had not decided who would handle the penalty phase, the court informed the parties that the penalty phase would commence the next day, December 9, 1983.

33. On December 9, 1983, the penalty phase began and defense counsel called only Christy's mother and a prosecution witness Robert DeRose.

34. Defense counsel, aware of the damaging testimony that DeRose might provide, called DeRose as a witness during the penalty phase. In essence, DeRose testified that Christy was not "crazy," and that petitioner had told him that he would kill people, especially any witnesses to a murder that he might commit.[11]

35. Trial counsel based the decision to call DeRose on their belief "that it was in Larry's best interest at this point in time to get a mitigating witness on the stand.... Quite frankly at that point in time we were hard-pressed to get mitigating circumstances into the record." App. 1, Tab E at 71.

36. Notwithstanding the importance and extent of the available medical evidence, defense counsel failed to investigate and proffer Christy's mental condition and its relevance to mitigation, and failed to introduce psychiatric evidence in support of the mitigating circumstances recognized under Pennsylvania law.[12]

37. During the penalty phase, the prosecution argued, contrary to Pennsylvania law, that because petitioner posed a future danger, and because the jurors may not want to be "another victim of the manipulator," the jury should sentence him to death. The prosecutor then argued that, even if they found one aggravating circumstance, "the sentence must be death." [13]

---

**11.** DeRose, in a statement to police which defense counsel had received, related a conversation in which Christy stated that he would kill any potential witnesses to any murder that he might commit.

**12.** Sections 9711(e)(2) and (e)(3) authorizes evidence that the defendant was "under the influence of extreme mental or emotional disturbance[,]" or that the defendant's capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law

was substantially impaired." 42 Pa.C.S.A. § 9711(e)(2) and (e)(3). Section 9711(e)(8) authorizes evidence "of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S.A. § 9711(e)(8).

**13.** Under Pennsylvania law, a sentence of life imprisonment carries no possibility of parole. Further, in the penalty phase of a capital case, finding that one or more aggravating circumstances may exist does not automatically man-

38. Trial counsel failed to object to these arguments.

39. During closing argument in the penalty phase, defense counsel informed the jury that "all 12 of you are going to have to agree on whatever decision that you make." App. 4, Tab M at 40.

40. The jury returned a verdict of death finding that two aggravating circumstances had been satisfied, namely, the victim was a prosecution witness, as provided in 42 Pa. C.S.A. § 9711(d)(5) (1982),[14] and the murder occurred during commission of a felony, as provided in 42 Pa.C.S.A. § 9711(d)(6) (1982).

41. The jury found no mitigating circumstances.

42. Upon completion of the penalty phase, the court replaced defense counsel and entertained post-trial motions, which were subsequently denied. The court entered judgment of conviction and sentence of death.

43. The Supreme Court of Pennsylvania, on appeal, reversed the jury's finding with respect to the aggravating circumstance of murder of a prosecution witness. The court further ruled that the jury should not have been instructed, as it was, regarding the aggravating circumstance concerning petitioner's criminal history. *Commonwealth v. Christy*, 511 Pa. 490, 515 A.2d 832 (Pa.1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987). The court concluded, however, that these errors, as well as trial counsel's errors,[15] were harmless or non-prejudicial, and affirmed Christy's conviction and death sentence. *Id.* at 841–44.

44. In September 1992, the Governor of Pennsylvania signed an execution warrant for Christy.

45. Christy petitioned for relief under Pennsylvania's Post–Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–9546, alleging, *inter alia*, due process violations, ineffective assistance of counsel, and that his conviction and sentence were constitutionally infirm. On November 9, 1992, the Court of Common Pleas of Cambria County, Pennsylvania, entered an order staying the execution until further order of court.

46. In June 1993, the Court of Common Pleas of Cambria County conducted a PCRA hearing, at which Christy's current counsel produced the testimony of Drs. Cooke, Wenger, and Shields. These doctors stated that they were ready and willing to testify at Christy's 1983 trial, but were never contacted by trial counsel.

47. The state court denied post-conviction relief and vacated the stay of execution. The Pennsylvania Supreme Court affirmed the judgment denying post-conviction relief. *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877(Pa.), *cert. denied*, 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995).

48. On February 15, 1996, the Governor again signed the execution warrant and scheduled execution for March 12, 1996.

49. On February 21, 1996, this court stayed Christy's execution, thereby enabling him to file a petition for habeas corpus relief. On April 17, 1996, Christy filed the instant petition.

---

date a sentence of death, so long as the jury finds at least one mitigating circumstance. *See* 42 Pa.C.S.A. § 9711(c) (1982).

**14.** According to prosecutors, section 9711(d)(5) (murder of a prosecution witness) applied because Christy shot Mr. Volk a third time to prevent his testimony in any subsequent criminal proceeding against Christy. The Pennsylvania Supreme Court held that there was no evidence to establish that Mr. Volk was, or ever would have been a prosecution witness. *Christy*, 515 A.2d at 842. Further, the court noted that Christy's conversation with DeRose, wherein he made general threats against any possible wit-

nesses against him, "was not specific enough to prove beyond a reasonable doubt that Appellant killed Mr. Volk to prevent his testimony in a criminal proceeding." *Id.*

**15.** The Pennsylvania Supreme Court found that trial counsel "were ineffective for allowing evidence of [Christy's] ... prior incarcerations to be heard by the jury." *Christy*, 515 A.2d at 837–38. The court further found ineffectiveness because of trial counsel's failure to object to Kiniry's cross-examination in which he intimated that Christy was faking, and had feigned mental illness so he could serve time in a more comfortable environment. *Id.* at 838–39.

## II.  CONCLUSIONS OF LAW

1.  The court has jurisdiction over the parties, and subject matter jurisdiction pursuant to 28 U.S.C. § 2254.[16]

2.  Section 2254(a) provides that: "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

3.  Before a federal court may consider a state prisoner's claims challenging the constitutional validity of his conviction, the prisoner must first satisfy the exhaustion requirements of 28 U.S.C. § 2254(b) and (c).

4.  Section 2254(b) provides that a writ of habeas corpus "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b).  Section 2254(c) further provides that "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise ... the question presented." 28 U.S.C. § 2254(c).

5.  The Supreme Court of Pennsylvania has considered and rejected each of the claims presented in the instant petition. Therefore, we hold that petitioner, having withdrawn the unexhausted claim for relief based on *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), has exhausted his state court remedies with respect to all claims submitted for review. 28 U.S.C. § 2254(b); *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).[17]

**16.**  As rehearsed, because Christy's petition was filed before April 24, 1996, we will employ the standards applicable before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996.  *See* cases accompanying note 1.

**17.**  The alleged *Cooper* violation, which is not an issue in the instant petition, concerns whether a state violates a defendant's right to due process by requiring a defendant to bear the burden of establishing by clear and convincing evidence his

## A.  IMPROPER JURY INSTRUCTIONS

6.  Petitioner's contention that the trial court erroneously instructed the jury and deprived him of due process is without merit. Specifically, Christy argues that the trial court improperly instructed the jury on the burden of proof with respect to specific intent to kill.[18]  The court instructed the jury as follows:

> if you, in the testimony that was presented are satisfied beyond a reasonable doubt that on the morning of the 16th of June, 1980, Lawrence Christy was, in fact, so drugged and/or intoxicated that he was not capable of forming a specific intent to kill, you could then—but all of the other elements of murder of the first degree would be present—then you would consider the murder in the third degree.

App. 4, Tab L at 76–77.

7.  Christy further complains that the trial judge failed to instruct the jury that, under Pennsylvania law, when evidence of self-defense arises from any source, the Commonwealth must disprove self-defense beyond a reasonable doubt.

■  8.  A reviewing court considering alleged improper jury instructions must not consider "what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).  "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*

incompetence to stand trial.  *See Christy v. Horn*, 115 F.3d 201, 203 (3d Cir.1997).

**18.**  We decline to consider Christy's contention that the trial court misstated Pennsylvania law with respect to the issue of aggravating and mitigating factors.  As noted by respondent, to do so would convert the instant petition into a mixed petition and subject to dismissal.  *See Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

9. We recognize that a single instruction to a jury may not be "judged in artificial isolation, but must be viewed in the context of the overall charge." *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Viewing the alleged erroneous jury instruction in light of the entire charge in this case, we find that "the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279, 113 S.Ct. 2078. Although one segment of the instructions is somewhat unclear, viewing the totality of the instructions, as we must, we find that they properly set forth the correct standard and the appropriate burdens of proof. Moreover, the basis for the jury's decision was undoubtedly Christy's confession and subsequent trial testimony and not the unclear instruction.

10. As to the trial court's failure to instruct the jury regarding the prosecution's burden of disproving self-defense, there was no basis for the court to instruct the jury on self-defense. Christy's confession and testimony revealed that he shot the victim while he was wounded and unarmed. More importantly, Christy stated that he fired the third shot into Mr. Volk's head, not because he feared that he might suffer serious bodily injury, but because he believed that Mr. Volk was suffering. The court's failure to instruct on the basis of self-defense was harmless under the circumstances.

## B. DUE PROCESS VIOLATION/IMPROPER PROSECUTION ARGUMENTS

11. Inflammatory and prejudicial statements by a state prosecutor, evidencing a desire to improperly prejudice a defendant, may be serious enough to warrant federal habeas relief. *See United States ex rel. Clark v. Fike*, 538 F.2d 750, 760 (7th Cir. 1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977). To rise to the level of a constitutional error, prosecutorial misconduct that does not implicate a specific provision of the Bill of Rights must have been "so egregious that it deprived the defendant of a fair trial, thus making the resulting conviction a denial of due process." *United States ex rel. Shaw v. DeRobertis*,

755 F.2d 1279, 1281 (7th Cir.1985). To determine the effect of prosecutorial misconduct, a reviewing court must consider the erroneous acts in the context of the entire trial, and each case must be determined on its own facts. *See United States ex rel. Garcia v. Lane*, 698 F.2d 900, 902 (7th Cir.1983).

12. To state a claim for habeas relief based upon comments at trial by the prosecutor, a petitioner must show that the prosecutor's comments were so egregious that they fatally infected the proceedings and rendered the entire trial fundamentally unfair. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643–45, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Lesko v. Lehman*, 925 F.2d 1527, 1546 (3d Cir.), *cert. denied*, 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991). A petitioner must show that there is a reasonable probability that the alleged error affected the outcome of the trial, that is, absent the alleged impropriety the verdict likely would have been different. *See Davis v. Zant*, 36 F.3d 1538, 1545 (11th Cir.1994).

13. Christy contends that the prosecution's arguments during both the guilt and penalty phases of the trial were false and based on evidence dehors the record and, therefore, the arguments deprived Christy of due process.

### 1. Guilt Phase

14. During the guilt phase closing arguments, prosecutor McGlynn argued to the jury that Christy had "some unknown, unnamed mental illness[.]" Also, McGlynn informed the jury that

If a person asserts that they are suffering from a mental illness, they can prove that. And how do you prove it? With medical testimony. You bring in psychiatrists. You submit to examinations. You produce those records for the jury. You produce those witnesses so that you can hear the doctor say he wasn't capable. He was incompetent. That didn't happen. I submit to you that if that testimony was available you would have heard, but you didn't hear it; therefore, you can logically draw the assumption that he is medically and mentally fit; more importantly, responsible for his actions.

15. Although the Pennsylvania Supreme Court found that the prosecution's arguments "were not outside permissible boundaries of oratorical flair[,]" *Com. v. Christy*, 540 Pa. 192, 656 A.2d 877, 885, we find that the argument is false and misleading because McGlynn was involved in at least six involuntary proceedings in which Christy was committed to Farview and Mayview. The prosecutor knew that such medical evidence existed and was available when he made the argument. Further, McGlynn knew that Christy was mentally disturbed, as evidenced from notes that he submitted during the involuntary commitment proceedings.

16. McGlynn knew from his prior position in Cambria County, and from the pretrial competency hearing, that significant medical evidence existed which supported Christy's claims of mental impairment. Thus, when McGlynn argued before the jury that the defense was a sham, he attempted to influence the jury with information that he knew was false.

17. By attempting to undermine the core of Christy's defense, and take advantage of the excluded medical records, the prosecutor exceeded the bounds of propriety by conveying false information to the jury.

18. A prosecutor may argue a case with vigor; however, he/she may not make intentional misrepresentations to the jury. *See Davis*, 36 F.3d at 1548 ("Little time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods").

19. Although McGlynn's conduct raises serious concerns, we hesitate to grant relief in light of Christy's confession and trial testimony. Without expert testimony to explain Christy's behavior and attending mental limitations, as Drs. Shields and Cooke subsequently provided, we cannot say that the verdict would have been different absent the prosecutor's lack of candor before the jury. *See Davis*, 36 F.3d at 1545 (noting that the improper arguments must "create a reasonable probability that the outcome was changed").

### 2. Penalty Phase

20. Christy contends that the prosecution misstated the law of aggravating and mitigating circumstances when Mr. Kiniry informed the jury that, if it found even one aggravating circumstance, the verdict must be death. Christy also takes issue with the prosecution's alleged prejudicial arguments during the penalty phase concerning the "revolving door," that petitioner was "the Great Manipulator," and that the jury should render a decision because they "are not going to be another victim of the manipulator[.]"

21. We agree that the prosecution misstated the law. Under Pennsylvania law, the jury must engage in a weighing process if it finds at least one aggravating and mitigating factor. *See* 42 Pa.C.S.A. § 9711(c)(iv) (1982).

22. Although the Pennsylvania Supreme Court found the prosecution's penalty phase argument was "no more than permissible 'oratorical flair' in arguing in favor of the death penalty[,]" *Christy*, 515 A.2d at 843, we conclude that the arguments crossed the line from "flair" to foul.

23. First, Kiniry's reference to Christy as the "Great Manipulator" was unfair and prejudicial, in light of credible records detailing Christy's mental illness. Further, Kiniry knew that such records existed, and that trial counsel was unable to introduce the evidence.

24. Second, Kiniry's revolving door argument was improper because there was no chance that Christy would be released. Under Pennsylvania law, a sentence of life imprisonment carries no possibility of parole. Thus, Kiniry's argument only served to make the jury believe that Christy would serve less than life in prison.

25. Finally, the revolving door argument, when combined with Kiniry's argument that the jury should not be a victim of the Great Manipulator, was improper and preyed on the jury's fears that at some point in the future Christy would be released and harm them. Such arguments were directed to passion and prejudice, rather than to an understanding of the facts and the law. *See Lesko v. Lehman*, 925 F.2d 1527, 1545 (3d Cir.) (quoting *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 680 (3d Cir.1976)), *cert.*

*denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991).

26. Moreover, the trial court's instruction failed to remedy the problem. The court instructed the jury that:

[t]he sentence will depend upon your findings concerning aggravating and mitigating circumstances. The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances or if the jury finds at least one aggravating circumstance and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be sentence of life imprisonment in all other cases.[19]

App. 4, Tab M at 7.

27. Thus, the jury was left with the misimpression that, if Christy was sentenced to life imprisonment, he might later be released because of his manipulative powers and pose a future danger to society. Such arguments are an improper basis for imposing a sentence of death.

28. In reviewing improper prosecutorial comments during the penalty phase of a bifurcated capital case, the prosecutor's arguments are not harmless unless the state has demonstrated, beyond a reasonable doubt, that the remarks did not change the jury's exercise of discretion in choosing between life imprisonment or death. *See Lesko,* 925 F.2d at 1546.

29. The penalty phase of a capital case is one of the most critical proceedings in our criminal justice system. "It is clearly the most critical legal proceeding from the stand-point of the defendant whose life is at stake. Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices." *Lesko,* 925 F.2d at 1541.

30. We find that the prosecutor's arguments during the penalty phase undermined the jury's deliberative process and unconstitutionally tainted the jury's death finding.

## C. AKE VIOLATION/FAILURE TO APPOINT PSYCHIATRIST

31. Petitioner contends that the trial court's failure to appoint a psychiatrist to assist defense counsel during the guilt and penalty phases violated his due process rights. We agree.[20]

32. The Supreme Court has instructed that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Ake v. Oklahoma,* 470 U.S. 68, 76, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This "elementary principle" is grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness. Thus, while the Court has not held that a State must provide an indigent defendant with all the "tools" that a wealthier counterpart might buy, *see Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to those "basic tools" necessary to launch a meaningful defense. *See Ake,* 470 U.S. at 77, 105 S.Ct. 1087; *Britt v. North*

19. The trial court's failure to instruct the jury that Christy is ineligible for parole is not a basis for granting relief because *Simmons v. South Carolina* is not retroactive. 512 U.S. 154, 156, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (holding that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible"). The trial court's instruction in this case is relevant to our harmless error analysis.

20. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), applies to the instant petition because Christy's conviction did not become final until after February 26, 1985. *See, e.g., Castro v. Oklahoma,* 71 F.3d 1502, 1512 (10th Cir.1995) (applying *Ake* where petitioner's conviction did not become final until after *Ake* was issued); *Baxter v. Thomas,* 45 F.3d 1501, 1511 n. 22 (11th Cir.) (same), *cert. denied,* 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995); *Liles v. Saffle,* 945 F.2d 333 (10th Cir.1991) (same), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992).

*Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971).

33. In *Ake,* the Supreme Court extended the definition of "basic tools" to include the appointment of an expert in psychiatry for a defendant in a capital case when the defendant's sanity is a significant issue at trial. The Court reasoned that a defendant's interest in preventing an inaccurate determination of guilt outweighs the state's interest in avoiding the additional cost in a case where the assistance of an expert reduces the risk of an erroneous outcome. Failure to appoint an expert in such a case is a denial of due process.

34. We must determine (1) whether Christy made a sufficient showing to the trial judge that his sanity would be a "significant factor at trial," (2) whether petitioner received competent psychiatric assistance for his defense, *see, e.g., Cowley v. Stricklin,* 929 F.2d 640, 643 (11th Cir.1991), and (3) whether the refusal to provide Christy with psychiatric assistance was harmless error. *See Tuggle v. Netherland,* 516 U.S. 10, 14, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995) (remanding for determination whether harmless-error analysis applied); *United States v. Roman,* 121 F.3d 136, 144 (3d Cir.1997) (implicitly finding that harmless error analysis applies to *Ake* violations), *cert. denied,* —— U.S. ——, 118 S.Ct. 722, 139 L.Ed.2d 662 (1998); *Terry v. Rees,* 985 F.2d 283 (6th Cir.1993) (applying harmless error analysis to *Ake* violation).

### 1. Guilt Phase[21]

■ 35. We hold that the trial court was presented with ample evidence establishing that Christy's sanity and mental state were at issue and crucial to his defense.

36. First, in his PreTrial Omnibus motion, Christy expressly informed the trial court that his mental state at the time of the offense was in question. As noted by the Pennsylvania Supreme Court, counsel specifically requested psychiatric assistance.[22] The trial judge found that psychiatric evaluation was necessary, but required that the results of an evaluation should be made to the court and not to defense counsel.

37. Second, Judge Creany was informed that Christy had a long history of mental health problems and that petitioner had been in and out of mental hospitals during the seven years preceding the Volk murder. Indeed, Christy had been committed to at least five mental institutions in Pennsylvania from 1973 through 1979.

38. More importantly, Judge Creany had ordered Christy's commitment to mental institutions and, therefore, was well aware of petitioner's mental problems. Notwithstanding respondent's contrary arguments, the trial court was aware that Christy intended to pursue an insanity defense and that his mental state would be a significant factor at trial.

39. Under these circumstances, we hold that *Ake* required the appointment of a psychiatrist to assist petitioner in his defense. *See* 470 U.S. at 82, 105 S.Ct. 1087.

■ 40. We find that neither the assistance of Drs. Chavern nor Olivier satisfied the *Ake* test because they failed to address Christy's needs as the accused. Neither Chavern nor Olivier aided Christy in marshaling the facts to assist in developing any defenses, contrary to *Ake's* holding, *see* 470 U.S. at 83, 105 S.Ct. 1087, and neither doctor considered mitigating factors nor diminished capacity as defenses which are available under Pennsylvania law.

---

**21.** Contrary to the Pennsylvania Supreme Court's interpretation, *Ake* expressly concludes that psychiatric assistance must be made available for the defense "to help determine **whether that defense [insanity] is viable.**" 470 U.S. at 69, 105 S.Ct. 1087 (emphasis added). Hence, it does not follow that Judge Creany was justified in refusing to appoint a psychiatrist for Christy's defense merely because Dr. Chavern had found that Christy was sane at the time of the crime and competent for trial. Indeed, as long as there is a modicum of evidence indicating sanity, any indigent with mental impairment could be denied psychiatric assistance.

**22.** The Pennsylvania Supreme Court found that the record "reveal[ed] that Appellant's trial counsel did earnestly pursue the option of insanity as a possible defense. The matter was raised in an Omnibus Pre-trial Motion for Relief filed by Appellant's trial attorneys. The omnibus motion contained inter alia a notice of insanity defense and a motion for a psychiatric examination." *Christy,* 515 A.2d at 836.

41. Dr. Chavern testified at the competency hearing and undermined any defense that Christy might have hoped to pursue. Chavern testified that he had examined Christy and found him to be competent and that Christy showed no signs of schizophrenia or other evidence of insanity at the time of the crime.

42. Dr. Chavern's examination and resulting report were inadequate in numerous respects. First, according to Dr. Cooke (a forensic psychologist at Norristown), Dr. Chavern's one-page report failed to address the process by which he reached his conclusions or the bases for the conclusions. Second, Chavern did not review Christy's medical records prior to rendering his opinion. Indeed, Chavern conducted a conclusory review of Christy's records on the morning of the competency hearing. Third, Dr. Chavern confused the concepts of competency and mental state at the time of the offense. Finally, Dr. Chavern deemed it unnecessary to administer psychological tests to determine whether Christy was competent to stand trial or determine his mental state on the night of the offense.[23]

43. In addition, appointing psychiatrists such as Drs. Olivier and Chavern does not comport with the *Ake* requirements. *See, e.g., Liles v. Saffle,* 945 F.2d 333, 340 (10th Cir.1991); *Cowley v. Stricklin,* 929 F.2d 640, 645 (11th Cir.1991); *Smith v. McCormick,* 914 F.2d 1153 (9th Cir.1990). A defendant is denied the essential benefits of an expert when the services of the doctor must be shared with the prosecution. *See United States v. Sloan,* 776 F.2d 926, 929 (10th Cir. 1985). Although "[t]he right to psychiatric assistance does not mean the right to place the report of a 'neutral' psychiatrist before the court[, it does] ... mean[ ] the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate." *Smith v. McCormick,* 914 F.2d 1153, 1157 (9th Cir.1990). This right was denied petitioner under the circumstances.

44. We must next determine whether the failure to appoint a psychiatrist to assist in the guilt phase was harmless error. The Pennsylvania Supreme Court held that *Ake* assistance applies in vary narrow circumstances; specifically, where sanity at the time of the offense is a significant issue at trial. Further, the Court held that psychiatric assistance would not have provided Christy with a defense under Pennsylvania law because Christy was diagnosed merely with a personality disorder. We disagree.

45. As an initial matter, the Pennsylvania Supreme Court's narrow interpretation of *Ake* is contrary to the holding. In *Ake* the Supreme Court concluded that psychiatric assistance is required "**to help determine whether the insanity defense is viable.**" 470 U.S. at 82, 105 S.Ct. 1087 (emphasis added). Thus, implicit within *Ake,* such assistance is required when a defendant's mental state is at issue, even if the defendant ultimately abandons an insanity defense.

46. The Pennsylvania Court's conclusion that psychiatric assistance would not have provided Christy with a defense under Pennsylvania law is contrary to the evidence presented at trial. Under Pennsylvania law, a defendant may assert an insanity defense if "at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if the actor did know the quality of the act, that he did not know that what he was doing was wrong." 18 Pa. C.S.A. § 315.

47. Further, a defendant may assert a diminished capacity defense if the defendant can establish that "he was incapable of forming the specific intent to kill." *Commonwealth v. Legg,* 551 Pa. 437, 711 A.2d 430, 433 (Pa.1998). Although diminished capacity is a limited defense under Pennsylvania law, "[p]sychiatric testimony that addresses 'mental disorders affecting the cognitive functions of [deliberation and premeditation] necessary

---

**23.** According to Cooke, psychological testing is almost always necessary to determine a defendant's state of mind at the time of the offense, because a defendant's clinical presentation can change substantially between the time of the offense and the time of the evaluation. Further, Dr. Cooke stated that testing is necessary to a competency determination where a long history of mental illness is involved.

to formulate a specific intent' is admissible." *Id.* (quoting *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 943 (Pa.1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983)).

48.  Contrary to the Pennsylvania Supreme Court's finding that Christy merely had a personality disorder, which is irrelevant when considering an insanity or diminished capacity defense, the record is replete with multiple diagnoses that support the conclusion that Christy suffers from severe mental illness.

49.  Dr. Shields' testimony, which was presented during the post-conviction relief hearings, indicated that Christy might have, in fact, been able to succeed with a diminished capacity defense.  According to Shields, who had treated Christy a few months before the murder, Christy was in a state of transient psychosis when he shot Mr. Volk, and could not have deliberated or formed the specific intent to kill.  Rather than merely testifying whether Christy was unable to control himself, the evidence directly related Christy's underlying mental defect to his inability to formulate a specific intent to kill.

50.  Assuming that a psychiatrist had been provided to assist the defense, the theory could have been further explored and developed for use at trial.

51.  The failure of the trial judge to appoint a defense psychiatrist was not harmless under these circumstances.

### 2.  Penalty Phase

52.  The Supreme Court has held that the right to psychiatric assistance applies with equal force at the penalty phase of a capital case.  *Ake,* 470 U.S. at 83, 105 S.Ct. 1087.

53.  As rehearsed, Christy sought psychiatric assistance, but the request was denied.

■■■■  54.  The trial court's failure to provide psychiatric assistance was not harmless under the circumstances, given that Christy's mental condition was his only viable defense and his strongest argument in mitigation for sentencing purposes.

55.  During the penalty phase, a psychiatrist could have testified as to the impact of Christy's mental impairments on his conduct throughout his lifetime and particularly on the night in question.

56.  Further, a psychiatrist could have explained the effect of prolonged drug and alcohol abuse on an individual with Christy's mental impairments, as did Dr. Cooke.

57.  More importantly, psychiatric testimony was necessary to explain his horrible conduct, which had been presented to the jury, and to rebut the prosecutor's argument of future dangerousness.  *See Castro v. Oklahoma,* 71 F.3d 1502, 1514 (10th Cir. 1995).

58.  Christy's situation falls well within *Ake's* directive that a capital defendant whose mental condition is seriously at issue must be provided with expert assistance during the sentencing phase of a capital case.  *Accord Starr v. Lockhart,* 23 F.3d 1280, 1288 (8th Cir.1994), *cert. denied,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994).

59.  The trial court's failure to appoint a psychiatrist to assist defense counsel during the penalty phase deprived Christy of due process.

### D.  INEFFECTIVE ASSISTANCE OF COUNSEL

■■■■  60.  Trial counsel's deficient performance supports Christy's claim of ineffective assistance of counsel.[24]  The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel during the guilt and penalty phases of a capital case.  *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  For a defendant to gain relief because his counsel was ineffective, he must show "(1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's error, the result would have been different."  *Id.* at 687–96, 104 S.Ct. 2052.  A reasonable proba-

---

**24.**  The performance and prejudice components of the *Strickland* test are mixed questions of law and fact.  466 U.S. at 698, 104 S.Ct. 2052.

bility is one which is "sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

61. We are mindful that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689, 104 S.Ct. 2052. We presume that counsel's conduct is within the range of competence demanded of attorneys under like circumstances. *Id.* at 687–89, 104 S.Ct. 2052. However, when a petitioner shows that defense counsel "failed to exercise the customary skills and diligence that a reasonably competent attorney would exhibit under similar circumstances," the presumption must fail. *Starr v. Lockhart,* 23 F.3d 1280 (8th Cir.1994).

## 1. Ineffectiveness During Guilt Phase

### a. Unreasonable Conduct

62. We find that Christy has satisfied the first prong of the *Strickland* test because trial counsel's representation during the guilt and penalty phase fell below an objective standard of reasonableness for several reasons.

63. First, trial counsel's failure to object to the introduction of Christy's prior incarcerations during the guilt phase was unreasonable under the circumstances. Inexplicably, defense counsel elicited such evidence during direct and cross examinations. According to counsel, they wanted to show that the prosecution witness (DeRose) had been in jail in order to attack his credibility.

64. As the Pennsylvania Supreme Court found, such evidence should have been excluded, either by a motion in limine or a pretrial motion. *Christy,* 515 A.2d at 838. Further, the Court noted that trial counsel could have accomplished the same objective without revealing that Christy had also been in jail.

65. Second, trial counsel's failure to object to the prosecution's arguments that Christy was feigning mental illness was unreasonable given the defense of diminished capacity that counsel ultimately pursued.

66. Trial counsel testified that they failed to object throughout the trial because, in essence, they did not want to appear like a jack-in-the-box. However, given that diminished capacity was their ultimate defense, and given counsel's knowledge that McGlynn had in fact acted to commit Christy, failure to object was unreasonable. It is inconceivable that there would be anything gained, yet everything lost, by failing to object to an argument that cut at the very heart of Christy's defense.

67. Finally, trial counsel failed to object to the prosecution's request that Christy crawl on the floor and act out Mr. Volk's death. This reenactment could only have inflamed the jury's passion, and counsel's failure to object was unreasonable.

### b. Prejudice

68. Although counsel's conduct was unreasonable and ineffective, these errors, even if professionally unreasonable, do not warrant setting aside the judgment if the error had no effect on the verdict. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Berryman v. Morton,* 100 F.3d 1089, 1101 (3d Cir.1996).

69. When a defendant challenges a conviction, we must determine whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. Thus, the effect of counsel's "inadequate performance must be evaluated in light of the totality of the evidence at trial." *United States v. Gray,* 878 F.2d 702, 711 (3d Cir. 1989).

70. We find that notwithstanding counsel's numerous errors during the guilt phase, given the absence of psychiatric testimony to support Christy's diminished capacity defense, Christy did not suffer resulting prejudice, although the issue presents a very close question. Given Christy's confession and subsequent testimony, it is unlikely that, assuming that counsel had been effective, they would have impacted the outcome of the guilt phase of trial.

## 2. Ineffectiveness During Penalty Phase

### a. Unreasonable Conduct

71. We find that trial counsel's performance during the penalty phase is the most important issue raised in Christy's petition.

72. When a petitioner challenges a death sentence, as here, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052; *Hill v. Lockhart,* 28 F.3d 832, 838 (8th Cir.1994), *cert. denied,* 513 U.S. 1102, 115 S.Ct. 778, 130 L.Ed.2d 673 (1995).

73. Trial counsel's preparation for the penalty phase was unreasonable because they failed to investigate the mountain of mitigating evidence readily available to them. *See, e.g., United States v. Kauffman,* 109 F.3d 186, 191 (3d Cir.1997) (attorney's failure to conduct an investigation into client's mental illness, prior to entering a guilty plea, was unreasonable and prejudicial); *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) (decision cannot be reasonable when an attorney has failed to investigate options and make a reasonable choice), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). Further, counsel failed to contact any of Christy's treating physicians, who subsequently stated that, if contacted, they would have testified on Christy's behalf.[25]

74. According to trial counsel, they were "hard pressed" to find any mitigating evidence. As evidenced from this statement, trial counsel failed to consider Christy's medical history and records as evidence readily available to support petitioner's defense. Such testimony reveals that the preparation for the penalty phase was negligible at best. *See, e.g., Hill v. Lockhart,* 28 F.3d 832, 842–43 (8th Cir.1994). Such a performance fails to comport with the notion that the sentencing phase of a capital case is a distinct procedure where the jury's attention is focused not just on the circumstances of the crime, but also on special facts about the defendant that may militate against imposing capital punishment. *See Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976);

*Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989).

75. Trial counsel's failure to utilize available evidence with neither satisfactory explanation nor justification demonstrates conclusively that they did not make a significant effort, based on reasonable investigation and logical argument, to present Christy's fate to the jury and to focus the jury's attention on mitigating factors. *See, e.g., Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995) ("where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance"), *cert. denied,* 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996); *United States v. Gray,* 878 F.2d 702 (3d Cir.1989) (finding that counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when he has not yet obtained the facts on which such a decision could be made); *Osborn v. Shillinger,* 861 F.2d 612, 629 (10th Cir.1988) (finding ineffectiveness where counsel failed to attempt to introduce medical evidence of mitigation at penalty phase). Where a life hangs in the balance, the failure is inexcusable, unreasonable and manifestly prejudicial. *See, e.g., Hill v. Lockhart,* 28 F.3d 832 (8th Cir.1994).

76. The failure to utilize the available medical evidence was not the result of a tactical decision. Rather, it was the result of a failure to prepare for the critical stage of the proceedings. *See Lesko v. Lehman,* 925 F.2d 1527, 1541 (3d Cir.1991) (noting the importance of the penalty phase of a capital case). There was no reason to ignore this evidence, especially to rebut the prosecution's continuing argument that Christy was allegedly faking. The evidence could only have helped.[26]

---

**25.** During the PCRA hearing, Drs. Shields, Wenger, and Cooke testified that they had not been contacted by trial counsel and, had they been contacted, they would have testified on Christy's behalf.

**26.** The PCRA court and the Pennsylvania Supreme Court found that exclusion of the vast

array of psychiatric and psychological evidence helped rather than prejudiced Christy because such evidence portrayed Christy as a "highly dangerous person" who might kill again. However, as noted by petitioner, the jury could not consider non-enumerated aggravating factors, such as future dangerousness. *See* 42 Pa.C.S.A.

77. In addition, trial counsel's reasons for ignoring this evidence are flawed. According to counsel, they did not seek any psychiatric testimony for use during the penalty phase because Dr. Chavern had concluded that Christy was competent at the time of the event and trial, and understood the nature and quality of his acts.

78. As attorney Roberto opined, counsel was obviously confused about the mitigating circumstances. Roberto explained that simply because Chavern found that Christy was sane at the time of the offense did not preclude a finding of mitigating circumstances as defined by Pennsylvania law. *Accord Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995) (noting that there are differing legal standards in the guilt and penalty phases and that "[e]vidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase"). We find that counsel's failure to comprehend the law of mitigating circumstances is objectively unreasonable.

79. Trial counsel's performance was also unreasonable because they failed to object to the prosecution's improper and prejudicial characterization of Christy as the "Great Manipulator," and they failed to object to the arguments with respect to the revolving door and the return of the accused to the community.

80. In addition, counsel's decision to call DeRose during the penalty phase was unreasonable. DeRose testified on Christy's behalf as a character witness. Indeed, he testified as to Christy's kindness towards himself and his family.

81. Under Pennsylvania law, Christy was entitled to offer evidence of his good character to establish mitigating circumstances during the penalty phase. *See* 42 Pa.C.S.A. § 9711(a)(2) and (e). However, trial counsel must have known, and indeed testified as such, that once they sought character witness testimony, the witness would be subject to

cross-examination regarding the bad acts that Christy had committed. *See Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373, 382–83 (Pa.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Commonwealth v. Jones,* 341 Pa. 541, 19 A.2d 389, 393–94 (Pa.1941).

82. Although trial counsel knew of Christy's damaging statement to DeRose, namely, he would kill any witnesses to a murder that he might commit, counsel called DeRose as a character witness.

83. Finally, counsel's closing argument during the sentencing phase that "all twelve of you are going to have to agree on whatever decision that you make" was unreasonable as well as legally incorrect. Under Pennsylvania law, if there is less than unanimous agreement for death, a defendant must be sentenced to life imprisonment. *See* 42 Pa. C.S.A. § 9711(c)(1)(v) (1982). Trial counsel, by making a legally incorrect argument at a critical point, acted unreasonably and prejudicially. *See Frey v. Fulcomer,* 974 F.2d 348, 359 (3d Cir.1992) (finding trial counsel's legally incorrect argument during penalty phase unreasonable), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

**b. Prejudice**

84. Even though the record is replete with examples of ineffective assistance of counsel during the penalty phase, Christy's petition cannot be granted if there was no attending prejudice. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

85. Trial counsel's failure to offer Christy's readily available medical evidence satisfies the prejudice requirement. *See Armstrong v. Dugger,* 833 F.2d 1430, 1434 (11th Cir.1987). The medical evidence of Christy's psychiatric history may have demonstrated to the jury that petitioner was not the totally evil person that they apparently determined him to be, and therefore should not be put to death. Certainly Christy's medical evidence would have provided some

---

§ 9711 ("Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d)"). *See also Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (noting that even though evidence of men-

tal retardation and an abused childhood might be a "two-edged sword" by establishing the probability of future dangerousness, a jury must be allowed to consider the mitigating effects of such evidence.) *Id.* at 324, 109 S.Ct. 2934.

counterweight to the evidence of aggravating circumstances that was received.

86. Further, counsel's failure to seek admission of this evidence had a pervasive effect on the penalty phase because it effectively enabled the prosecution to capitalize on their recurring argument that Christy's mental illness was a sham.

87. The evidence, which trial counsel could have secured with little effort, would have supported Christy's bare assertions of mental illness and would have undermined the prosecution's arguments that Christy was faking.[27]

88. While it is unlikely that we can determine with precision the outcome of the proceedings if trial counsel had fulfilled their obligation, the evidence adduced at the evidentiary hearing is sufficient to establish that a jury would not have imposed the sentence of death after being informed of Christy's psychiatric history and problems. This evidence was crucial in that it would have given the jury a reason to be lenient.

89. The Supreme Court has held that the Constitution prohibits imposition of the death penalty without adequate consideration of factors that might evoke mercy. *See, e.g., California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In this case, none of Christy's medical evidence was provided to the jurors, even though the available evidence supports Christy's contention that he suffers from severe mental limitations. Responsibility for the failure to present this evidence to the jury is imputed to the state through the ineffective assistance of Christy's Sixth Amendment counsel. *See Coleman v. Thompson,* 501 U.S. 722, 754, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (noting that attorney error that constitutes a violation of a petitioner's right to counsel "must be seen as an external factor, i.e., 'imputed to the State' ").

90. Counsel's failure to present the evidence was compounded by the prosecutors' improper closing argument in which they argued that Christy was feigning mental illness.

91. The constitutional errors at Christy's penalty phase of the trial infected the process to such a degree that the risk of Christy being wrongly sentenced to death requires issuance of the writ of habeas corpus to prevent a fundamental miscarriage of justice. Pennsylvania law requires that the jury balance the mitigating and aggravating circumstances in determining whether a death sentence is warranted. *See* 42 Pa.C.S.A. § 9711(c)(iv) (1982) (sentence must be death if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances); *Frey v. Fulcomer,* 974 F.2d 348, 368 (3d Cir.1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). The jury cannot fulfill this responsibility when a proper mitigating factor is not considered and an improper aggravating factor is considered, as here.

92. We conclude that Christy's trial counsel rendered ineffective assistance in violation of the Sixth Amendment. The writ of habeas corpus will be granted, subject to the holding of a new trial or other appropriate relief within a period of 120 days.

## CONCLUSION

The penalty of death "differs from all other forms of criminal punishment, not in degree but in kind." *Harmlin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). Because of the finality of the penalty, state "factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). In light of the significant constitutional errors committed in the underlying state court proceedings, the petition of Lawrence Duane Christy for a writ of habeas corpus must be granted.

We will order counsel for petitioner to submit a proposed order to this court within 20 days which sets forth with specificity the

---

27. Ms. Roberto opined that failure to contact Christy's treating physicians was unreasonable as well as prejudicial, and meant that the jury heard

no evidence corroborating Christy's testimony regarding his mental state at the time of the offense.

relief that petitioner is seeking under the circumstances in accordance with the foregoing findings of fact and conclusions of law.

### ORDER

AND NOW, this 10th day of November, 1998, after a petition for a writ of habeas corpus filed by the petitioner, Lawrence Duane Christy, and upon review of the petition and the record,

IT IS ORDERED that the petition for a writ of habeas corpus filed by Lawrence Duane Christy shall be and hereby is granted.

IT IS FURTHER ORDERED that counsel for petitioner shall submit a proposed order to this court within twenty (20) days which sets forth with specificity the relief that petitioner is seeking under the circumstances.