**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 12 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KELLY LAMONT ROGERS,

      Petitioner-Appellant,

v.

GARY E. GIBSON, Warden;
ATTORNEY GENERAL OF THE
STATE OF OKLAHOMA,

      Respondents-Appellees.

No. 98-6301

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 97-CV-282)

---

Robert Wade Jackson of Jackson & Presson (Steven M. Presson, of Jackson & Presson, with him on the brief), Norman, Oklahoma for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma for Respondents-Appellees.

---

Before **PORFILIO**, **BALDOCK**, and **BRISCOE**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

      On December 17, 1991, an Oklahoma jury convicted Petitioner Kelly Lamont

Rogers of first degree murder in the death of Karen Marie Lauffenburger, a student at

Oklahoma State University. The same jury also convicted Petitioner of two counts of first degree robbery, one count of first degree rape, and one count of larceny of a motor vehicle. In the penalty phase of the trial, the jury recommended the death penalty for Lauffenburger's murder, fifty and seventy-five year terms for the two robbery convictions, one-hundred fifty years for the rape conviction, and fifty years for the larceny conviction.

Petitioner appealed the judgment and sentences to the Oklahoma Court of Criminal Appeals. The state appellate court denied Petitioner's appeal on January 24, 1995. Rogers v. State, 890 P.2d 959 (Okla. Crim. 1995). The United States Supreme Court denied Rogers' Petition for Writ of Certiorari on October 10, 1995. On September 16, 1996, Petitioner filed an application for post-conviction relief with the Oklahoma Court of Criminal Appeals. The court denied the application on February 25, 1997. Rogers v. State, 934 P.2d 1093 (Okla. Crim. 1997). On February 28, 1997, Petitioner commenced this action in federal district court when he filed an application to proceed in forma pauperis. The district court granted the application and appointed counsel on March 4, 1997. Counsel filed the 28 U.S.C. § 2254 petition for a writ of habeas corpus on April 23, 1997, asserting fifteen grounds for relief. On June 18, 1998, the district court denied the petition and granted a certificate of appealability ("COA") under

28 U.S.C. § 2253, for three of the fifteen claims raised.[1]  Petitioner timely filed a notice of appeal.  In Petitioner's opening brief, he requested that we grant a COA for seven of the twelve issues on which the district court had previously denied a COA.  We deny Petitioner's request for a COA for the seven additional issues.  Consequently, we address the following three issues on appeal: (1) whether Petitioner was denied access to state-funded investigatory and expert assistance in violation of Ake v. Oklahoma, 470 U.S. 68 (1985); (2) whether variations between the allegations in the information and the proof at trial prejudiced Petitioner and renders his conviction for first degree rape constitutionally deficient; and (3) whether the unconstitutional standard of proof imposed upon Petitioner at his post-examination competency hearing violated his Fourteenth Amendment right to due process and undermined the reliability of the proceedings in violation of the Eighth Amendment.   In reviewing the denial of a habeas corpus petition, we review the district court's factual findings under a clearly erroneous standard, and its legal conclusions de novo.  Castro v. State of Oklahoma, 71 F.3d 1502, 1510 (10th Cir. 1995).  Under the AEDPA, our review of the state court's proceedings is quite limited, however.  We may not grant habeas relief unless the state court's decision was:

---

[1] Petitioner asserts that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which includes the COA requirement, do not apply to this case.  We disagree.  Petitioner's § 2254 petition was filed almost a year after the April 24, 1996, effective date of the AEDPA.   Therefore, the AEDPA provisions apply to this case.  See Lindh v. Murphy, 117 S.Ct. 2059, 2068 (1997) (AEDPA generally applies only to cases filed after the AEDPA became effective); see Nguyen v. Reynolds, 131 F.3d 1340, 1345 (10th Cir. 1997).

(1) . . . contary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2). Our jurisdiction arises under 28 U.S.C. §§ 1291and 2253. We affirm.

## I. Background

At approximately 10:15 p.m. on December 19, 1990, Lauffenburger's fiancé discovered Lauffenburger's nude body in her apartment in Stillwater, Oklahoma. Lauffenburger, a part-time pizza delivery person, had disappeared that evening while delivering pizzas in the Stillwater area. After she failed to return from a delivery, Eric Zanotelli, the manager of the pizza restaurant where she worked, became concerned and attempted to locate her. He retraced her route and drove to the location of her last delivery, an apartment rented to Audra Lynn Todd. Petitioner lived with Todd and is the father of her three children. Todd told Zanotelli that Lauffenberger had delivered the pizza and left. Concerned, Zanotelli called Lauffenburger's fiancé who went to Lauffenburger's apartment and discovered the body.

The events leading up to Lauffenburger's murder transpired as follows. After Lauffenburger delivered the pizza to Todd's apartment around 7:00 p.m., Petitioner took a knife from Todd's apartment, followed Lauffenburger and robbed her of $40.00. Petitioner and Lauffenburger then drove to her apartment where Petitioner raped her.

4

After the rape, Petitioner drove Lauffenburger to a nearby automated teller machine, where she withdrew $175.00 from her account at 7:52 p.m. Petitioner then returned Lauffenburger to her apartment and murdered her. After the murder, Petitioner drove, in Lauffenburger's car, to the vicinity of Todd's apartment where Lauffenburger's 1984 Toyota Tercel, keys and identification were found at 5:15 a.m. the next morning.

On December 20, 1990, Defendant was charged by Information with first degree murder for Lauffenburger's death. The court declared Petitioner indigent on December 26, 1990, and appointed counsel the same day. On January 29, 1991, Petitioner was charged by Information with two counts of robbery by force, first degree rape, and larceny of a motor vehicle. Defendant was tried before a jury and convicted on all counts. In the penalty phase, the jury found three aggravating factors: (1) the murder was especially heinous, atrocious, or cruel; (2) Petitioner posed a continuing threat to society; and (3) Petitioner had previously been convicted of a felony involving violence. The jury recommended the death penalty, and the trial court sentenced Petitioner to death for the murder conviction.

## II. Analysis

### A. Investigatory and Expert Assistance

Petitioner, relying heavily on Ake v. Oklahoma, 470 U.S. 68 (1985), argues that he was denied access to state-funded investigatory and expert assistance in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Petitioner alleges

5

two specific Ake violations: (1) denial of funds for a qualified mental health expert; and (2) denial of funds for an investigator and forensic expert. The facts relevant to these claims are set forth below.

On September 19, 1991, Petitioner's appointed counsel, Jack S. Bowyer, filed a motion with the trial court to retain an expert witness at state expense. The motion did not identify the type of expert or explain how the expert would aid in the defense. However, at a hearing held the same day, Bowyer explained that he needed funds to hire an investigator to gather witness statements and to hire a forensics expert and a medical doctor to test the state's theories of the case. The trial court denied the requests.

At the November 18, 1991, motion hearing, the state requested an examination of Petitioner by a state psychiatrist. Bowyer opposed the motion and requested that, if granted, Petitioner was entitled to state funds to employ his own psychiatrist. On December 2, 1991, the trial judge granted the state's motion and granted Petitioner's request to hire, at public expense, a mental health professional to conduct a competency examination. Dr. Thomas A. Goodman, M.D., a psychiatrist, conducted the state's examination of Petitioner. Dr. Jack P. Schaefer, Ph.D., a clinical psychologist examined Petitioner for the defense. Dr. Schaefer only evaluated Petitioner's competency to stand trial and did not address Petitioner's mental condition at the time of the offense. Dr. Schaefer did not assist Bowyer during the guilt or penalty stages of the trial.

The trial court held a post-examination competency hearing on December 6, 1991,

6

and determined that Petitioner was competent to stand trial. At the hearing, Bowyer argued that he had been unable to employ a mental health expert whose credentials equaled Dr. Goodman's. Bowyer asked for a continuance so he could hire another mental health expert. The trial judge denied the request. After the trial began on December 9, 1991, Bowyer renewed his request for a continuance based in part on his need for additional time to find a mental health expert who could render an opinion regarding Petitioner's mental condition when the crime was committed. The trial judge denied the request, noting that Dr. Schaefer had testified as an expert witness on numerous occasions and was "fully qualified as a mental health professional."

## 1. Psychiatric Expert

Petitioner argues that the trial court erred by refusing to provide his counsel with additional time and funds to hire a mental health expert who could assist with both the guilt and penalty phases of the trial. Petitioner asserts that if his requests were granted, evidence about his neuropsychological development and abilities, as documented by Petitioner's June 15, 1996, examination by Michael M. Gelbort, Ph.D., a licensed psychologist, could have been discovered and presented at trial and that such evidence would have altered the trial's outcome.

An indigent defendant must have "a fair opportunity to present his defense." Ake v. Oklahoma, 470 U.S. 68, 76 (1985). This principle is derived in significant part from the Fourteenth Amendment's due process guarantee of fundamental fairness, id., and in

7

part from the Sixth Amendment's guarantee of the "fundamental right to a fair trial." See Strickland v. Washington, 466 U.S. 668, 685 (1984). In Ake, the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. at 74. This requirements applies to both the guilt and penalty phases of capital proceedings. See id. at 83 (obligation to provide psychiatric experts arises "when the State presents psychiatric evidence of the defendant's future dangerousness."); see also Moore v. Reynolds, 153 F.3d 1086, 1108 (10th Cir. 1998). Relying upon Ake, we have held that in the sentencing phase, an expert must be appointed if the State presents evidence, "psychiatric or otherwise, of the defendant's future dangerousness or continuing threat to society" and the defendant "establishes the likelihood his mental condition is a significant mitigating factor." Castro v. State of Oklahoma, 71 F.3d 1502, 1513 (10th Cir. 1995) (citing Brewer v. Reynolds, 51 F.3d 1519, 1529 (1995)).

In the present case, the district court concluded that Petitioner did not make the threshold showings with respect to either the guilt or penalty phases of the trial.[2] We

---

[2] In making this determination, the district court reviewed the information available to the trial court at the time it denied Petitioner's request for additional time and funds to secure a mental health expert. Petitioner asserts this was error, relying on Castro v. State of Oklahoma, 71 F.3d 1502, 1514-15. Petitioner argues that the district court
(continued...)

8

agree.  In order for a defendant to be entitled to a psychiatric expert, he must offer "more than undeveloped assertions that the requested assistance would be beneficial."  Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1 (1985).  "In order for a defendant's mental state to become a substantial threshold issue, the showing must be clear and genuine, one that constitutes a close question which may well be decided one way or the other."  Castro, 71 F.3d at 1513 (quoting Liles v. Saffle, 945 F. 2d 333, 336 (10th Cir. 1991)).  In this case, the trial court had nothing before it that suggested that Petitioner's sanity at the time of the offense would be a significant factor at trial.  Dr. Schaefer's report did not address Petitioner's sanity at the time of the offense.  Although Dr. Goodman's report is not included in the record, Petitioner does not assert that the report called into doubt his sanity at the time of the offense.

Petitioner points to the statement he made to officers after his arrest, that he "blacked out" after the stabbing, to show that the trial court should have recognized that his sanity was likely to be a significant factor at trial.  While Petitioner's statement could suggest an emotional disturbance *after* the crime was committed, without more, it did not

---

<sup>2</sup>(...continued)
should have considered the material counsel obtained post-conviction in determining whether Petitioner could have made the Ake showing.  Petitioner fails to recognize, however, that in the portion of the Castro opinion that he relies upon, we were applying a different standard, one that *only* applies in cases where Ake was decided after the trial but while a direct appeal was still pending.  See Castro, 71 F.3d at 1513.  In such cases, we determine whether the defendant "could have made a threshold showing under Ake" instead of whether the defendant actually made such a showing to the trial court.  See id.

"demonstrate to the trial judge that his sanity at the time of the offense [was] to be a significant factor at trial." Ake, 470 U.S. at 83.

In addition, trial counsel repeatedly informed the trial court that Petitioner had instructed him not to raise an insanity defense, and that, as a result, counsel would not raise the defense. Although the failure to assert an insanity defense does not defeat Petitioner's Ake claim, see Liles v. Saffle, 945 F.2d 333, 340 (10th Cir. 1991), it is relevant to the determination of whether the trial court should have recognized that Petitioner's sanity was likely to be a significant factor at trial. Considering all the information before the trial court at the time of the request for a psychiatric expert, we conclude that Petitioner failed to make the requisite showing under Ake.[3]

Finding no error at the guilt phase, we turn to the penalty phase of the proceedings. At this stage as well, Petitioner failed to make the requisite preliminary showing. Petitioner must establish that (1) the state presented evidence in the sentencing phase that Petitioner was a continuing threat to society; and (2) that his mental condition was likely

---

[3] To salvage his Ake claim, Petitioner attempts to raise a Sixth Amendment ineffective assistance of counsel claim. Petitioner argues that his trial counsel was ineffective because even though counsel had Petitioner's medical records, counsel failed to use the records to support the request for a psychiatric expert. Petitioner further argues that if the medical records had been introduced to the trial court, Ake's threshold showing would have been satisfied. Although we did not grant a certificate of appealability as to any of Petitioner's Sixth Amendment claims, we nonetheless considered the ineffective assistance argument in the limited context of the Ake claim and find no substance to it.

to be a significant mitigating factor.[4]  See Castro, 71 F.3d at 1513.  Petitioner meets the

first prong of this test, because the state relied upon Petitioner's "continuing threat to

society" as one of the aggravating circumstances in the case.[5]  Petitioner did not,

however, demonstrate to the trial court that his mental condition would be a significant

mitigating factor.  Petitioner points to nothing in the record in support of his claim that he

satisfied this threshold showing.

Even assuming that Petitioner was constitutionally entitled to a mental health

---

[4]  We recognize that under Ake, if the state had used *psychiatric* evidence to show that Petitioner was a continuing threat to society, he would automatically be entitled to expert psychiatric assistance.  See Castro, 71 F.3d at 1513.  Petitioner does not assert, and the record does not show, that the state used psychiatric evidence in the sentencing phase.  Therefore, Petitioner must also show that he demonstrated to the trial court that his mental condition was likely to be a significant mitigating factor.  See id.

[5] We have rejected a narrow interpretation of Ake by holding that the presentation of psychiatric evidence of future dangerousness is *not* necessary to trigger entitlement to a psychiatric expert.  See  Castro, 71 F.3d at 1513 (citing Brewer v. Reynolds, 51 F.3d 1519, 1529 (10th Cir. 1995)).  Ake holds that a defendant is entitled to a psychiatric expert if psychiatric evidence is presented.  Ake, 470 U.S. at 83-84.  The state of Oklahoma argues that our broad interpretation of Ake conflicts with Oklahoma's interpretation, which tracks Ake and *requires* psychiatric evidence at the sentencing stage in order for a defendant to be entitled to a psychiatric expert.  Thus, the state of Oklahoma asserts that in light of § 2254(d)(1) of the AEDPA, we cannot grant habeas relief because Oklahoma's interpretation is not "contrary to" or and "unreasonable application of" Ake.  28 U.S.C. § 2254(d)(1).  We recognize that under the standard set forth in § 2254(d)(1) of the AEDPA, we look to federal law "as determined by the Supreme Court of the United States" when reviewing state court decisions.  Thus, it is questionable whether our decision in Castro, which expands upon Ake, is the proper precedent to apply in § 2254 habeas actions.  We have yet to decide these issues or interpret the amount of deference owed to state courts under § 2254(d)(1), and decline to do so here, because regardless of whether we apply our broad interpretation of Ake or defer to Oklahoma's narrower one, Petitioner's claim fails.

expert during the sentencing phase, we find the lack of such assistance harmless error. See Castro, 71 F.3d at 1515 (applying harmless error analysis to denial of a psychiatric expert in violation of Ake). Petitioner has not shown that the error "had substantial and injurious effect or influence." Castro, 71 F.3d at 1515-16 (quoting Brewer, 51 F.3d at 1529). First, the jury's decision to recommend the death penalty was based on two additional aggravators: (1) the murder was especially heinous, atrocious and cruel; and (2) Petitioner was previously convicted of a violent felony. Because Petitioner's continuing threat to society was not the only aggravator weighed by the jury, the exclusion of the mitigating evidence was harmless. See Moore, 153 F.3d at 1111 (finding harmless error where the defendant should have been allowed to present mitigating evidence regarding his mental condition, but where continuing threat was not the only aggravator). Second, we are not persuaded by Dr. Gelbort's August 28, 1996, affidavit that Petitioner "*would be a recurring threat to the community if released*, [but] he is virtually no threat within the prison setting." (emphasis added). Neither this report nor Petitioner's medical records refute the allegation that Petitioner is a continuing threat to society. Consequently, after reviewing the record in this case, we are not left with "a significant doubt that this evidence would have caused at least one juror to choose life rather than death." Moore, 153 F.3d at 1110. Accordingly, the district court did not err in denying relief on this claim.

## 2. Investigator & Forensic Expert

Petitioner also argues that the trial court's refusal to appoint an investigator and a forensics expert violated his constitutional rights. Indigent defendants are entitled to a "fair opportunity to present their defense at trial." United States v. Kennedy, 64 F.3d 1465, 1473 (10th Cir. 1995). Indigent defendants are not, however, entitled to "all the assistance that . . . wealthier counterpart[s] might buy." Id. The Constitution requires access to the "basic tools" needed to present an adequate defense. Ake, 470 U.S. at 77. To determine whether Petitioner was constitutionally entitled to the requested assistance, we consider three factors: (1) the effect on Petitioner's private interest in the accuracy of the trial if the requested assistance is not provided; (2) the burden on the state if the assistance is provided; and (3) the probable value of the additional assistance and the risk of error in the proceeding if such assistance is not provided. Kennedy, 64 F.3d at 1473.

On February 12, 1991, counsel filed a motion seeking the appointment of a private investigator. Counsel renewed the motion on May 17, 1991, stating that a private investigator was necessary "to locate the witnesses and completely explore the parameters of the defense." During a hearing on September 19, 1991, counsel informed the court that he was a solo practitioner and needed an investigator "to aid and assist me in gathering witness' statements and . . . exculpatory evidence in favor of" Petitioner. At the time, the prosecution's witness list included more than fifty names. The trial court denied the request.

13

From the record, it appears that Petitioner's counsel sought a state-appointed investigator because he needed assistance interviewing the large number of witnesses in the case. We have previously rejected a constitutional claim based on the court's refusal to provide a defense investigator, where the trial attorney had asserted that he was "overworked, [and] many witnesses were involved in the case." Coleman v. Brown, 802 F.2d 1227, 1237 (10th Cir. 1986). Likewise, in Castro v. Ward, we rejected the argument that a large number of witnesses necessitated the appointment of an investigator. 138 F.3d 810, 826 (10th Cir. 1998). Here, Petitioner offered the trial court nothing more than "undeveloped assertions"that the requested assistance would have been beneficial in trial preparation. Without more, we find Petitioner failed to meet his burden of showing that investigative assistance was necessary to an adequate defense. See Caldwell v. Misssissippi, 472 U.S. 320, 323 n. 1 (1985) (no due process violation where the petitioner offered "little more than undeveloped assertions that the requested assistance would be beneficial").

On September 19, 1991, Petitioner asked the trial court for a state-appointed forensic expert to counter the state's anticipated evidence regarding hair and fiber samples and the medical examiner's report. Counsel stated that he needed the expert assistance to review the potential evidence, evaluate its weight and discover any exculpatory evidence. The trial court denied the request. We find no constitutional error in the denial. Petitioner merely speculates that the requested assistance would have been

14

beneficial.  Therefore, we find that Petitioner has failed to show that the denial of a

forensic expert substantially prejudiced his case.  See Moore, 153 F.3d at 1112.[6]

## B. Allegations in Information

As his second ground for relief, Petitioner challenges his conviction for first

degree rape.  Petitioner argues that the Information charged him with only one act of rape,

but the evidence at trial suggested two separate acts of sexual intercourse.  Petitioner

contends that this variance between the Information and the evidence at trial deprived him

of his Sixth Amendment "right to be informed of the nature and cause of the accusations

filed against him."[7]  Hunter v. State of New Mexico, 916 F.2d 595, 598 (10th Cir. 1990).

"A variance arises when the evidence adduced at trial establishes facts different from

those alleged in an [information]."  Dunn v. United States, 442 U.S. 100, 105 (1979).

---

[6] Petitioner asserts that the alleged Ake violations undermined the reliability of his capital sentence.  Therefore, Petitioner argues that the imposition of the death penalty in this case violates the Eighth Amendment requirement of heightened reliability.  See Eddings v. Oklahoma, 455 U.S. 104 (1982).  Thus, as Petitioner conceded at oral argument, the Eighth Amendment claim is dependent upon the success of his Ake claims. Because we find that Petitioner's fundamental right to a fair trial has not been violated under Ake, we necessarily conclude that Petitioner's Eighth Amendment claim fails as well.

[7] The state argues that Petitioner failed to exhaust his state court remedies as to this claim.  The district court did not address the exhaustion argument, and we need not here because it is proper to consider an unexhausted claim on the merits for the purpose of denying relief.  See 28 U.S.C. § 2254(b)(2) ("an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust" state remedies).  Furthermore, it appears that Petitioner did in fact raise the variance claim in his direct appeal.  See Rogers v. State, 890 P.2d 959, 969 (Okla. Crim. 1995).

15

Such a variance is not reversible error, however, unless the variance affects the "substantial rights of the accused." United States v. Edwards, 69 F.3d 419, 432 (10th Cir. 1995). A variance affects substantial rights if the defendant is "prejudiced in his defense because he cannot anticipate from the [Information] what evidence will be presented against him or is exposed to the risk of double jeopardy." Hunter, 916 F.2d at 599.

The January 29, 1991, Information charged Petitioner with one count of first degree rape through "the use of force and violence and by means of threats of immediate and great bodily harm . . . ." The evidence before the jury could suggest that two separate acts of sexual assault occurred, one while the victim was still alive and one at or after the time of the victim's death.[8] The prosecution argued in closing argument that the:

> "defendant forced her to have sex with him twice, two times . . . . [W]hen he took her to her apartment, he forced her to have sexual intercourse with him there. . . . Then he took her back to her apartment, and forced sexual intercourse with her again. . . . After stabbing her repeatedly . . . he accomplished sexual intercourse with her . . . after he had killed her."[9]

---

[8] Physical evidence found on the victim's jeans and underwear indicate that after sexual intercourse the victim put her clothes back on. The medical examiner's testimony indicated that the vaginal injuries sustained by the victim occurred at or after the time of death. In addition, the victim's body was found unclothed. This evidence suggests that two separate acts of sexual assault occurred. Under the state's theory of the case, after the first rape occurred, the victim dressed and was taken by Petitioner to withdraw money from the automated teller machine, then was returned to her apartment where Petitioner stabbed her and sexually assaulted her corpse.

[9] We note that the arguments of counsel during opening and closing statements are not evidence and that the trial judge so instructed the jury.

16

First, Petitioner argues that because one of the two alleged acts of sexual intercourse is legally insufficient to constitute the crime of rape, and the jury was given inadequate instructions to distinguish between the two, the conviction must be reversed. See Yates v. United States, 354 U.S. 298, 312 (1957), overruled on other grounds, Burks v. United States, 437 U.S. 1 (1978), (verdict must be set aside "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"). Specifically, Petitioner argues that because the jury was not expressly instructed that the crime of rape under Okla. Stat. tit. 21 §1114 requires sexual intercourse with a living person,[10] his conviction may have been based on a legally unsupportable ground, i.e., sexual intercourse with a dead body. We disagree. Although the jury instructions do not expressly inform the jury that the crime of rape can be committed only against a living person, the allegations in the Information and jury instruction No. 42, adequately informed the jury that the victim must have been alive in order for a rape to occur.

The Information, read to the jury prior to the start of the state's case, alleged that Petitioner committed rape in the first degree when he "overc[a]me all resistance on the part of Karen Marie Lauffenberger" through the "use of force and violence and by means of threats of immediate and great bodily harm." In addition, instruction No. 42 informed

_____

[10] The state does not challenge Petitioner's contention that sexual intercourse with a dead body does not constitute the crime of first degree rape under Oklahoma law.

17

the jury that rape constitutes sexual intercourse: "accomplished by means of force, violence or threats of force or violence accompanied by apparent power to carry out the threats, which overcomes that person's resistance." The above language presupposes that the victim of the rape must have been alive at the time of the assault because of the statements requiring the perpetrator to overcome the victim's resistance. See Rogers v. State, 890 P.2d 959, 969 (Okla. Cr. 1995) (holding that the phrase "that person" in the context of the jury instruction presupposes a living human being). This is so because a person's resistance would be irrelevant if the defendant was accused of sexually assaulting a dead body. Thus, the jury was properly instructed that a post-mortem sexual assault was not sufficient to constitute the crime of rape. Therefore, we conclude that any variance between the Information and the evidence presented at trial did not prejudice Petitioner.

Second, Petitioner argues that the variance between the Information and the evidence exposes him to the risk of double jeopardy. Petitioner argues that because the prosecution submitted evidence at trial of two separate acts of sexual intercourse, and the Information did not designate which act the charge was based upon, the evidentiary basis the jury relied upon in reaching the guilty verdict is unclear. As a result, Petitioner argues that should the state attempt to charge him again based on events occurring on December 19, 1990, he could be put in jeopardy twice for the same offense, because it is impossible to discern which acts formed the basis of his first degree rape conviction. We disagree.

18

As discussed above, the jury was properly instructed that Lauffenberg must have been alive in order for the jury to find Petitioner guilty of first degree rape. Therefore, Petitioner's conviction for rape was based upon the act of sexual intercourse which occurred while the victim was still alive, not on any sexual act that may have occurred after the victim died. Thus, there is no confusion as to the basis of the verdict and no double jeopardy exposure. Any variance between the Information and the evidence was not fatal in that Petitioner will not be subjected to double jeopardy because of it.

### C. Post-examination Competency Hearing

As his final ground for relief, Petitioner asserts that the clear and convincing standard of proof employed at his competency hearing violated his Fourteenth Amendment due process rights and undermined the reliability of the capital proceedings against him in violation of the Eighth Amendment. As a result of the unconstitutional standard of proof, Petitioner sought either a new competency hearing employing a constitutional burden of proof or a new trial. The district court denied the requested relief.

Oklahoma law in effect at the time of Petitioner's competency hearing required criminal defendants to prove their incompetence to stand trial by "clear and convincing evidence." Okla. Stat. tit. 22 § 1175.4(B). In 1996, however, the Supreme Court held that Oklahoma's clear and convincing standard in competency hearings violated the right to due process under the Fourteenth Amendment. Cooper v. Oklahoma, 517 U.S. 348

19

(1996). Therefore, the trial court employed an unconstitutional standard when conducting Petitioner's competency hearing. Petitioner did not, however, raise this claim in his direct appeal. As a result, the state argues that the claim is procedurally barred.

Mental competency claims may raise both substantive and procedural due process claims. See Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995) (differentiating between procedural and substantive competency claims). A procedural competency claim may be procedurally barred, but a substantive mental competency claim may not. See Nguyen v. Reynolds, 131 F.3d 1340, 1346 (10th Cir. 1997). This distinction is not only important for purposes of procedural default but also in determining the standard of review. To the extent that Petitioner argues that his competency hearing inadequately ensured that he was competent to stand trial because of the unconstitutional burden of proof, we will construe the claim as one of procedural due process. See Walker v. Attorney General for the State of Okla., — F.3d —, 1991 WL 84050 at *4 (10th Cir. Feb. 22, 1999).

### 1. Procedural Default

Petitioner's direct appeal was filed in 1993 and denied in January 1995, prior to the Supreme Court's decision in Cooper. Thus, Petitioner first raised his Cooper claim in his application for post-conviction relief. The Oklahoma Court of Criminal Appeals, citing Walker v. State, 933 P.2d 327, 338-39 (Okla. Crim. 1997), denied the claim on the ground that the court has "declined to apply Cooper on post-conviction review." Rogers

20

v. State, 934 P.2d 1093, 1096 (Okla. Crim. 1997). In Walker, the Oklahoma appeals court held that all Cooper claims not raised on direct appeal are waived on collateral review even where the direct appeal is pre-Cooper. 933 P.2d at 339.

The Walker court applied the 1995 amendments to Oklahoma's post-conviction procedures, which bar post-conviction relief where the claim was not raised on direct appeal unless the petitioner can show that the issue "could not have been raised in a direct appeal." Okla. Stat. tit. 22 § 1089(C)(1). A claim is unavailable on direct appeal if "the legal ground supporting it either was not recognized by the court as precedent at the time of direct appeal or is a new rule of constitutional law which has been given retroactive effect." Walker, 933 P.2d at 339. Applying these new standards, the court concluded that the challenge to the clear and convincing burden of proof could have been raised by Walker in his direct appeal, even though Cooper had not yet been decided. Id. Importantly, prior to the 1995 amendments, Petitioner would not have been procedurally barred from raising his Cooper claim, as an intervening change in the law, for the first time in his application for post-conviction relief. See Valdez v. State, 933 P.2d 931, 933 n.7 (Okla. Crim. 1997) (noting that 1995 amendments "greatly circumscribed" the court's power to apply intervening changes in the law to post-conviction applicants). With this background in mind, we turn to Petitioner's case.

Claims that have been defaulted in state court on an independent and adequate state procedural ground will not be considered on federal habeas review, unless the

21

petitioner can demonstrate cause and prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991). An independent state procedural ground is "adequate" if it has been "strictly or regularly followed and applied evenhandedly to all similar claims." Hickman v. Spears, 160 F.3d 1269, 1271 (10th Cir. 1998) (internal quotations omitted). We determine whether a procedural rule was firmly established and regularly followed by looking to the time of the asserted procedural default. Walker, 1999 WL 84050 at *4.[11] In the present case, we conclude that Petitioner's Cooper claim is not procedurally barred because the 1995 amendments had not yet been enacted in 1993, the time of Petitioner's purported default.[12] In Walker, we addressed the 1995 amendments in the same context, and concluded that "a defendant cannot be expected to comply with a procedural rule that does not exist at the time of the purported default." Id. We fail to see how a procedural rule can be "firmly established and regularly followed" if it did not exist at the time of the default. Thus, we conclude here, as we did in Walker, that Petitioner's failure to challenge the clear and convincing standard on direct appeal does not bar federal habeas review of the claim.

## 2. Competency Claim

---

[11] Although coincidentally the defendants have the same surname, this case is unrelated to Walker v. State, 933 P.2d 327.

[12] Petitioner filed his direct appeal in 1993 and the court of criminal appeals denied it in January 1995. The post-conviction procedures at issue in this case did not become affect until November 1, 1995.

In order to obtain habeas relief on a procedural competency claim, Petitioner must show that the trial court ignored facts which raised a "bona fide doubt" regarding Petitioner's competency to stand trial. Walker, 1999 WL 84050 at *5; see also Castro v. Ward, 138 F.3d 810, 818 (10th Cir. 1998). Although this standard is normally applied in cases where the trial court failed to hold a competency hearing, it applies with equal force to a case such as this where an unconstitutional burden of proof was employed at the competency hearing. See Walker, 1999 WL 84050 at *5. Relevant to our inquiry is "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." Id. (quoting Drope v. Missouri, 420 U.S. 162, 180 (1975)).

During the preliminary hearing, Stillwater, Oklahoma police officer Lloyd Romine testified that after his arrest, Petitioner made statements to officers that he may have "blacked out" after the stabbing and couldn't remember what he did with the murder weapon or how he got out of the victim's apartment and into her car. As a result of this testimony, the state filed a motion for a mental examination of Petitioner. The trial judge granted the motion and authorized Petitioner to employ his own mental health practitioner to conduct an examination. After the examinations were completed, the trial court held a competency hearing. The trial judge considered the reports of the state's psychiatrist, Dr. Goodman, and the psychologist retained by Petitioner, Dr. Schaeffer. Both reports concluded that Petitioner was competent to stand trial. Dr. Schaeffer concluded that

23

Petitioner was able to appreciate the nature of the charges against him and was able to consult with and rationally assist his lawyer in preparing his defense. Dr. Schaeffer also found that Petitioner was not mentally ill. Our review of the record simply does not reveal evidence sufficient to raise a bona fide doubt regarding Petitioner's competency at the time of his trial.[13] Accordingly, the district court properly denied relief.

### III. Conclusion

For the reasons stated above, the judgment of the district court is AFFIRMED.

---

[13] To the extent that Petitioner's claim may be construed as raising a substantive competency claim, we find that Petitioner fails to satisfy the even higher burden applied in such cases. In order to obtain relief on a substantive claim, Petitioner must demonstrate by "clear and convincing evidence" a "real, substantial and legitimate doubt" as to his competence to stand trial. Walker, 1999 WL 84050 at * 3 (internal citations omitted). Because we find that Petitioner failed to meet the bona fide doubt standard, likewise, we find that he failed to meet this more stringent standard. We therefore reject any claim by Petitioner that he was tried while incompetent.